Caleb ALDERMAN; Barbara Alderman; and Alaska Guestours, Inc., dba Fourth Avenue Theater Trolley Tours, Appellants,

v.

IDITAROD PROPERTIES, INC., dba Fourth Avenue Theatre, and Robert Gottstein, Appellees.

No. S–9285.

Supreme Court of Alaska.

Oct. 12, 2001.

Robert C. Erwin and Roberta C. Erwin, Erwin & Erwin, L.L.C., Anchorage, for Appellants.

Herman G. Walker, Jr., Koval & Featherly, P.C., Anchorage, for Appellees.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

CARPENETI, Justice.

## I. INTRODUCTION

During the 1998 Anchorage tourist season, both Robert Gottstein's Iditarod Properties and Caleb and Barbara Alderman's Alaska Guestours operated separate trolley tours named "Fourth Avenue Theater Trolley Tours" from the front of the historic Fourth Avenue Theatre [1] owned by Iditarod. Iditarod sued the Aldermans for trade name infringement. A jury found that the Aldermans had infringed Iditarod's trade name "Fourth Avenue Theatre" [2] and had breached a lease agreement for the use of the theater's

ticket booth. The Aldermans appeal numerous issues including the application of trade name law, the jury verdict, the interpretation of the business name registration statute, the amendment of the pleadings, and the award of attorney's fees. We affirm on all issues except the superior court's decision to allow amendment of the pleadings after the close of evidence.

## II. FACTS AND PROCEEDINGS

Caleb and Barbara Alderman are the owners of Alaska Guestours, Inc. In 1994 the Aldermans started a trolley tour business in Anchorage. In 1996 they adopted the name "Anchorage Trolley Tours."

Robert Gottstein is the sole shareholder of Iditarod Properties. In 1991 Iditarod acquired the Fourth Avenue Theatre, a historic building in downtown Anchorage. Iditarod spent approximately three and one half million dollars restoring the Fourth Avenue Theatre. Newspapers and historical preservation societies applauded the renovation of the theater. The newly renovated theater re-opened in 1992.

The theater contains a gift shop, cafe, television studio, movie and video theater, banquet room, and catering company. "Fourth Avenue Theatre" was used as the name for the gift shop and cafe. Iditarod advertised the theater on the radio and in tourist publications. The Fourth Avenue Theatre was listed among the largest banquet facilities in the state. At times, Iditarod received letters from customers addressed to the "Fourth Avenue Theatre," instead of to its corporate name.

In 1995 the Aldermans obtained a parking permit for their trolley in front of the Fourth Avenue Theatre. The Aldermans approached Gottstein to inquire about selling tickets for their trolley tour from the theater. Gottstein and the Aldermans made an oral agreement to rent the theater ticket booth as a location for the Aldermans to sell trolley

---

**1.** The theater is variously referred to in the pleadings on file as the "Fourth Avenue Theater" and the "Fourth Avenue Theatre." This opinion uses the latter spelling, which appears to be both the oldest and most consistently used.

**2.** The jury was asked, "Are the names, '4th Avenue Theatre,' '4th Avenue Theater,' 'Fourth Avenue Theatre,' and 'Fourth Avenue Theater,' trade names?" It answered in the affirmative.

tickets, to rent office space in the theater basement, and to have Iditarod employees sell trolley tour tickets in the theater gift shop. The Aldermans claim the parties agreed that the rent was fifteen percent of ticket sales from the ticket booth and gift shop only. Iditarod claims the rent agreement was for fifteen percent of the gross revenues from the Aldermans' entire trolley tour business.

Despite the apparent misunderstanding, this arrangement survived until about October 1997. Other conflicts between Iditarod and the Aldermans culminated in a final confrontation, resulting in the Aldermans moving out of the theater and into an office next door. The Aldermans performed no accounting for 1997 rents owed to Iditarod.

Several months after the final disagreement, the Aldermans registered the business name "Fourth Avenue Theater Trolley Tours." They had previously registered the name "Fourth Avenue Trolley."

Gottstein investigated the possibility of Iditarod operating a trolley tour business. Iditarod requested a parking permit in front of the theater that required moving the Aldermans' trolley parking space. The city allowed the Aldermans to choose a different space farther down the street, but they selected a location that was still partially in front of the theater. By May 1998 Iditarod and the Aldermans were operating competing trolley tours in front of the Fourth Avenue Theatre. Both operated under the name "Fourth Avenue Theater Trolley Tours." Customers were confused over which trolley tour business they had bought tickets for.

In May 1998 Iditarod's counsel sent the Aldermans a cease and desist letter demanding that the Aldermans stop using the name "Fourth Avenue Theater." The Aldermans rejected Iditarod's demand, and Iditarod filed this lawsuit.

Iditarod alleged trade name infringement and requested an injunction and damages. The Aldermans' answer denied using the name "Fourth Avenue Theater Trolley Tours." They counterclaimed against Iditarod for unfair competition, trade dress infringement, intentional interference with contractual relations, breach of the covenant of good faith and fair dealing, and punitive damages.

Both sides moved for partial summary judgment on various issues. Superior Court Judge Brian C. Shortell granted summary judgment, holding that the Aldermans did not have an exclusive right to use the name "Fourth Avenue Theater Trolley Tours" by virtue of its registration under AS 10.35.040; that evidence did not support the Aldermans' claim of intentional interference with contractual relations; and that Iditarod had the right to use the name "Fourth Avenue Theatre Trolley Tours." The superior court denied summary judgment on the Aldermans' claims that Iditarod engaged in unfair competition; that the Aldermans had an exclusive right to use the "Fourth Avenue Theater Trolley Tours" business name under AS 10.35.040; and that Iditarod did not infringe the Aldermans' trade dress.

Trial commenced in May 1999. The Aldermans testified that they used the trade name "Fourth Avenue Theater Trolley Tours" in the fall of 1997. At the close of evidence, the trial court granted Iditarod's motion to amend its pleading to add a cause of action for breach of contract.

By special verdict, the jury found that: (1) "Fourth Avenue Theatre" was a trade name; (2) Iditarod owned the trade name; (3) the Aldermans used Iditarod's trade name in a way likely to cause confusion; (4) Iditarod did not engage in unfair competition; (5) Iditarod did not use trade dress belonging to the Aldermans; (6) the Aldermans violated the rent agreement by failing to pay fifteen percent of gross revenues from trolley tour tickets sold at the theater; and (7) the amount of the breach was $13,924.05. Based on the verdict, the trial judge entered a judgment on July 26, 1999.

On August 5 Iditarod moved for an award of attorney's fees. On August 19 the Aldermans filed a notice of appeal. On August 27 the trial judge denied Iditarod's motion for attorney's fees without prejudice for failure to provide sufficient specificity of actual fees incurred. On November 4 Iditarod filed a corrected motion for attorney's fees. The trial court granted Iditarod an enhanced

award of $46,795, based on forty percent of actual fees under Alaska Civil Rule 82(b)(3).

The Aldermans appeal the jury findings of Iditarod's trade name and Aldermans' infringement of it, the summary judgment ruling that the Aldermans did not have exclusive right to the name "Fourth Avenue Theater Trolley Tours" under AS 10.35.040, the amendment of the pleadings at the close of evidence, and the award of attorney's fees.

## III. STANDARDS OF REVIEW

■ Denial of summary judgment is reviewed de novo.[3] Issues of statutory interpretation are questions of law that we review in our independent judgment.[4] On questions of law, our duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[5]

■ We review a trial court's decision to permit amendment of the pleadings for an abuse of discretion.[6] Jury instructions that involve rules of law are reviewed de novo.[7] "The jury's factual findings, if supported by the evidence presented at trial, will not be disturbed where there is room for diversity of opinion among reasonable people."[8]

■ We review the trial court's award of attorney's fees for an abuse of discretion.[9] We will find that a trial court abused its

discretion when, after reviewing the whole record, we are left with a definite and firm conviction that the trial court erred in its ruling.[10] If the award of attorney's fees requires interpretation of Alaska Civil Rule 82, we perform an independent review.[11]

## IV. DISCUSSION

■ Trade name infringement is an issue of first impression for this court. Alaska Statute 45.50.471(a) states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful." AS 45.50.471(b) defines "unfair methods of competition" and "unfair or deceptive acts or practices" to include acts:

(3) causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval, or another person's affiliation, connection, or association with or certification of goods or services.[12]

Because the language of Alaska's unfair trade practices law echoes that of federal trademark law found in the Lanham Act[13] and because interpretation and application of the Lanham Act is well developed by existing case law in other jurisdictions, we look to decisions of other courts interpreting the Lanham Act and other states' trademark law where the text is similar to that of Alaska's unfair trade practices law.[14] We begin with

---

**3.** See Western Pioneer, Inc. v. Harbor Enter., Inc., 818 P.2d 654, 656 n. 3 (Alaska 1991).

**4.** See Sauve v. Winfree, 907 P.2d 7, 9 (Alaska 1995).

**5.** See Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**6.** See Betz v. Chena Hot Springs Group, 742 P.2d 1346, 1348 (Alaska 1987).

**7.** See Aviation Assocs. Ltd. v. TEMSCO Helicopters, Inc., 881 P.2d 1127, 1130 n. 4 (Alaska 1994).

**8.** See Municipality of Anchorage v. Baugh Constr. & Eng'g Co., 722 P.2d 919, 927 (Alaska 1986).

**9.** See Stosh's v. Fairbanks North Star Borough, 12 P.3d 1180, 1183 (Alaska 2000).

**10.** See id.; see also Buster v. Gale, 866 P.2d 837, 841 n. 9 (Alaska 1994) (quoting Peter Pan Sea-

foods, Inc. v. Stepanoff, 650 P.2d 375, 378–79 (Alaska 1982)).

**11.** See City of Kodiak v. Parish, 986 P.2d 201, 202 (Alaska 1999).

**12.** AS 45.50.471(b)(3).

**13.** The Lanham Act states the federal rule in substantially similar terms:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, ... which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....
15 U.S.C. § 1125(a).

**14.** "Common law liability for unfair competition (which includes trademark infringement) is gov-

a brief overview of trade name and trademark law.

## A. Trademark and Trade Name Law in General

### 1. Terminology: trade name v. trademark

■ In the modern legal vernacular, "trade name" means a symbol used to distinguish companies, partnerships, and businesses.[15] By contrast, "trademark" refers to symbols used to distinguish goods and services.[16] This distinction blurs somewhat when talking about a service company—does "Fourth Avenue Theatre" distinguish the business or the services provided? Because "Fourth Avenue Theatre" is more typical of a business name and the dispute here is over its use as a business name, we treat this as a case involving a trade name rather than a trademark.

The distinction between trade name and trademark, however, is generally not a critical distinction,[17] and we conclude that it is not in this case. The United States Supreme Court noted the identity of protection for trademarks and trade names:

> Whether the name of a corporation is to be regarded as a trade-mark, a trade-name, or both, is not entirely clear under the decisions. To some extent the two terms overlap, but there is a difference, more or less definitely recognized, which is that, generally speaking, the former is applicable to the vendible commodity to which it is affixed, the latter to a business and its good will. A corporate name seems to fall more appropriately into the latter class. But the precise difference is not often material, since the law affords protection against its appropriation in either view, upon the same fundamental principles.[18]

Protection of trade names and trademarks is the same because trade names and trademarks serve the same basic purposes. "Although trade names [and] trademarks ... are used differently, they [both] serve the same basic purposes, that is, to identify a business and its products or services, to create a consumer demand therefor, and to protect any goodwill which one may create as to his goods or services."[19]

■ The same basic rules apply equally to trade names and trademarks.[20] Trademarks and trade names are classified in the same four categories. Analysis of infringement for both trademarks and trade names is done under a likelihood-of-confusion test.[21] Trade names, like trademarks and other types of trade symbols, are protected against use that is likely to cause confusion even if the related infringing use is non-competitive.[22] The term "trademark infringement" covers the use of one party's

---

erned by local law. Federal law, however, serves as persuasive authority because, for many years, it governed these areas almost exclusively and spawned a large body of federal decisions. As with federal law, the common law of trademarks is a portion of the broader law of unfair competition." Pennsylvania State Univ. v. University Orthopedics, Ltd., 706 A.2d 863, 870 (Pa.Super.1998) (quoting Goebel Brewing Co. v. Esslingers, Inc., 373 Pa. 334, 95 A.2d 523, 525–26 (1953)). We note that, unlike federal trademark infringement that provides national protection, the legal rights protected by common law infringement and unfair competition actions are limited to the territory in which the use is established. See Powder River Oil Co. v. Powder River Petroleum Corp., 830 P.2d 403, 407–08 (Wyo. 1992).

15. See 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 9:1 (4th ed.2000).

16. See id.

17. "The major legal distinction between trademarks and trade names is that trade names cannot be [federally] registered...." Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1534 (9th Cir.1989). Federal registration is not an issue in this case.

18. American Steel Foundries v. Robertson, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926) (citation omitted).

19. Younker v. Nationwide Mut. Ins. Co., 175 Ohio St. 1, 191 N.E.2d 145, 149 (1963).

20. See 1 McCarthy, supra note 15, § 9:1.

21. See Accuride, 871 F.2d at 1535 (rejecting argument that trade name infringement must be determined differently from trademark infringement).

22. See Standard Oil Co. v. Standard Oil Co., 56 F.2d 973, 978 (10th Cir.1932) ("[I]t is now well settled that the law of unfair competition is not

trade name as a trademark on another's goods or services [23] as well as the use of one party's trademark as part of another's corporate name.[24] Because the same basic rules and rationales apply equally to trade names and trademarks, we rely on trademark infringement case law in a trade name case such as this.

### 2. General concepts of trade name and trademark law

██ "Two elements must be proved to establish a prima facie case of unfair or deceptive acts or practices under the Alaska Act: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred." [25] Neither party contests that the Aldermans are engaged in trade or commerce. Thus, the focus is on establishing an unfair act or practice.

According to AS 45.50.471(a)(3), it is an unfair act or practice to "caus[e] a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval, or another person's affiliation, connection, or association with or certification of goods or services" [26]— in other words, trademark or trade name infringement. In general, to establish an unfair act or practice like trade name infringement, "the law has traditionally required proof of two basic elements: (1) Validity—that the public recognizes plaintiff's symbol as identifying his [business] and distinguishing [it] from those of others, and (2) Infringement—that defendant's actions cause

a likelihood of confusion among the relevant buyer class." [27] Validity could be shown in either of two ways: (a) that the symbol was inherently distinctive, or (b) that even if not inherently distinctive, the symbol has become distinctive through the acquisition of "secondary meaning," the mental association in buyers' minds between the trade name and a single business. Infringement is shown by analysis under a multi-factor likelihood-of-confusion test.

### B. "Fourth Avenue Theatre" Is a Valid Trade Name.

#### 1. General types of trade names

██ There are four types of trade names: (1) arbitrary or fanciful, (2) suggestive, (3) descriptive (including geographic or personal name), and (4) generic.[28] They differ in level of distinctiveness. Arbitrary, fanciful, and suggestive trade names are the most distinctive and qualify for protection under the Lanham Act or common law. Generic names are entirely non-distinctive and cannot receive such protection. In the middle are descriptive trade names, which may or may not receive protection depending on whether they have achieved a secondary meaning.[29]

██ Arbitrary, fanciful, and suggestive trade names are inherently distinctive.[30] An arbitrary trade name is a common word or symbol that is applied in a manner not

---

confined to cases of actual market competition.").

**23.** See *John Roberts Mfg. Co. v. University of Notre Dame Du Lac,* 258 F.2d 256, 262 (7th Cir.1958) (affirming ruling that use of "University of Notre Dame" on class rings is infringement); *Cornell Univ. v. Messing Bakeries, Inc.,* 285 A.D. 490, 138 N.Y.S.2d 280, 282–83 (1955), *aff'd,* 309 N.Y. 722, 128 N.E.2d 421 (1955) (enjoining certain uses of "Cornell" as trademark for bread).

**24.** See *Safeway Stores, Inc. v. Safeway Properties, Inc.,* 307 F.2d 495, 497–98 (2d Cir.1962) (affirming preliminary injunction against use of trademark "Safeway" as part of defendant's corporate name, Safeway Properties); *National Customer Eng'g, Inc. v. Lockheed Martin Corp.,* 43 U.S.P.Q.2d 1036, 1040 (C.D.Cal.1997) (finding a likelihood of confusion between trademark

"Mountain" and trade name "MountainGate" of manufacturer with similar products).

**25.** *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 534 (Alaska 1980).

**26.** AS 45.50.471(a)(3).

**27.** 2 McCarthy, *supra* note 15, § 15:1.

**28.** See *Railroad Salvage, Inc. v. Railroad Salvage, Inc.,* 561 F.Supp. 1014, 1019 (D.R.I.1983).

**29.** See *Metro Brokers, Inc. v. Tann,* 815 F.Supp. 377, 381 (D.Colo.1993).

**30.** *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

suggestive or descriptive of the business.[31] Examples of arbitrary trade names and trademarks are Sun Microsystems,[32] Stork Club (as a night club),[33] and Nova (as a television series).[34] A fanciful trade name is a word coined expressly for use as a trade name or an obscure or archaic term not inherently familiar to buyers.[35] Examples of fanciful trade names and trademarks include Exxon,[36] Polaroid,[37] and Clorox.[38] Arbitrary and fanciful trade names are broadly protected as strong trade names because their novelty identifies them uniquely to consumers;[39] the recognition of an arbitrary or fanciful name is almost entirely a reflection of the reputation developed by the single user.

 Suggestive terms "connote, rather than describe," some particular product or service; they require "use of the consumer's ingenuity to envisage the nature of the product or service."[40] Some examples of trade names and trademarks held to be suggestive rather than descriptive are Citibank,[41] Orange Crush,[42] and Tie Rak.[43] The concept of suggestive trademarks developed to avoid the draconian result of the 1905 Trademark Act's lack of protection for descriptive marks.[44] Courts could uphold the registration of trademarks that were only subtly "descriptive" by placing them in the inherently distinctive category of suggestive trademarks.[45]

 Generic names lie at the other end of the distinctiveness spectrum and are not protected.[46] Generic names are the actual names of the goods or services and, thus, cannot be distinctive of a unique source.[47] Some examples of terms held to be generic are Discount Mufflers,[48] Convenient Store,[49] and Lite Beer.[50] Generic names are not protectable as trade names because doing so would effectively remove words of common usage from the commercial vernacular. To permit exclusive trade name rights in a generic name would grant the owner of the generic name a monopoly because a competitor could not describe his business by its common generic term.[51]

31. *See* 2 McCarthy, *supra* note 15, § 11:11.

32. *See Sun Microsystems, Inc. v. SunRiver Corp.*, 36 U.S.P.Q.2d 1266, 1268–69 (N.D.Cal.1995).

33. *See Stork Restaurant, Inc. v. Sahati*, 166 F.2d 348, 355 (9th Cir.1948).

34. *See WGBH Educ. Found., Inc. v. Penthouse Int'l, Ltd.*, 453 F.Supp. 1347, 1350 (S.D.N.Y. 1978), *aff'd*, 598 F.2d 610 (2d Cir.1979).

35. *See* 2 McCarthy, *supra* note 15, § 11:5.

36. *See Exxon Corp. v. Xoil Energy Resources, Inc.*, 552 F.Supp. 1008, 1014 (S.D.N.Y.1981).

37. *See Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830, 837 (7th Cir.1963).

38. *See Clorox Chemical Co. v. Chlorit Mfg. Corp.*, 25 F.Supp. 702, 705 (E.D.N.Y.1938).

39. *See Stork Restaurant*, 166 F.2d at 355 (noting greater degree of protection given to fanciful marks than to names in common use); 2 McCarthy, *supra* note 15, § 11:6.

40. *Railroad Salvage*, 561 F.Supp. at 1020.

41. *See Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir.1984) (noting that "Citibank" is suggestive of an urban bank).

42. *See Orange Crush Co. v. California Crushed Fruit Co.*, 297 F. 892, 893 (D.C.Cir.1924) (finding "Orange Crush" was suggestive and not descriptive because a "person of average intelligence would not understand, when buying an orange crush drink, that he was getting a crushed orange").

43. *See Capitol Tie Rak, Inc. v. Tie Rack Stores, Inc.*, 150 U.S.P.Q. 357, 359 (N.D.Ill.1966) (noting "Tie Rak" was descriptive if selling tie racks but suggestive if selling ties).

44. *See* 2 McCarthy, *supra* note 15, § 11:63.

45. *See id.*

46. *See id.* § 12:1.

47. *See id.*

48. *See Discount Muffler Shop, Inc. v. Meineke Realty Corp.*, 535 F.Supp. 439, 446 (N.D.Ohio 1982).

49. *See Convenient Food Mart, Inc. v. 6–Twelve Convenient Mart, Inc.*, 690 F.Supp. 1457, 1464 (D.Md.1988), *aff'd*, 870 F.2d 654, 1989 WL 21392 (4th Cir.1989).

50. *See Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80–81 (7th Cir.1977).

51. *See CES Publ'g Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir.1975) (noting that to

■ Descriptive terms fall between generic names and suggestive trade names in distinctiveness.[52] A term is descriptive if it describes the intended purpose, function, or use of the goods, the size of the goods, the class of the users of the goods, a desirable characteristic of the goods, the nature of goods, or the end effect upon the user.[53] Some examples of trade names and trademarks found to be descriptive are Beer Nuts,[54] Fashionknit,[55] and Raisin–Bran.[56]

■ Descriptive terms are categorized as inherently non-distinctive and, as such, entitled to protection only upon a showing of "secondary meaning" or a mental connection between the trade name and a single business.[57] The United States Supreme Court has stated two reasons for this extra requirement for protection.[58] First, because descriptive terms can be truthfully applied to a whole range of goods and services, a descrip-

tive term cannot, *per se*, function to identify and distinguish the goods or services of only one seller in the marketplace. A descriptive term merely informs the buyer of an alleged quality of the product but does not help the consumer to distinguish between products of different sellers.[59] Second, descriptive terms are regarded as words in the "public domain" in the sense that all sellers should be free to truthfully use these terms to describe their merchandise. "[O]ne competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods."[60]

■ A subcategory of descriptive terms is the geographically descriptive term.[61] Examples include ALASKA,[62] Bank of America,[63] and Boston.[64] Proof of secondary meaning is required for protection of geographically descriptive names for the same reasons that secondary meaning is required

permit exclusive trademark rights in a generic mark "would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are").

52. *See* 2 McCarthy, *supra* note 15, § 11:64.

53. *See id.* § 11:16.

54. *See Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 942 (10th Cir.1983) (affirming that "Beer Nuts" was descriptive of salted nuts).

55. *See Franklin Knitting Mills, Inc. v. Fashionit Sweater Mills, Inc.*, 297 F. 247, 248 (S.D.N.Y. 1923), *aff'd*, 4 F.2d 1018 (2d Cir.1925) (concluding that "Fashionknit" was descriptive of fashionable sweaters).

56. *See Skinner Mfg. Co. v. Kellogg Sales Co.*, 143 F.2d 895, 898 (8th Cir.1944) (concluding that "Raisin Bran" was descriptive of raisin and bran breakfast cereal).

57. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753.

58. *See Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 543–44, 40 S.Ct. 414, 64 L.Ed. 705 (1920) ("[T]he law would not secure to any person the exclusive use of a trademark consisting merely of words descriptive of the qualities, ingredients, or characteristics of an article of trade; this for the reason that the function of a trade-mark is to point distinctively, either by its own meaning or by association, to the origin or ownership of the wares to which it is applied, and words merely descriptive of qualities, ingredients, or characteristics, when used

alone, do not do this. Other like goods, equal to them in all respects, may be manufactured or dealt in by others, who, with equal truth, may use, and must be left free to use, the same language of description in placing their goods before the public.").

59. *See* 2 McCarthy, *supra* note 15, § 11:18.

60. *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir.1970).

61. *See* 2 McCarthy, *supra* note 15, § 14:1.

62. *See Alaska Northwest Publ'g Co. v. A.T. Publ'g Co.*, 319 F.Supp. 963, 965 (D.Alaska 1970), *rev'd on other grounds*, 458 F.2d 387 (9th Cir.1972) (finding "Alaska" as title of sporting magazine about Alaska is geographically descriptive with no secondary meaning: "Geographical names are non-exclusive when they are descriptive of a locality or the origin of a product. Thus, the magazine title 'ALASKA,' named after the State of Alaska, is not capable of exclusive appropriation by the plaintiff.").

63. *See In re BankAmerica Corp.*, 231 U.S.P.Q. 873, 875 (T.T.A.B.1986) (deciding that "Bank of America" is geographically descriptive and not inherently distinctive).

64. *See Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181–83 (1st Cir.1993) (concluding that "Boston" as name of beer manufacturer with headquarters in Boston is geographically descriptive with no secondary meaning).

for descriptive names.[65]

■ Personal names are another subcategory of descriptive names. Examples include Gucci[66] and Waterman.[67] They too are considered inherently non-distinctive for reasons similar to those for descriptive terms and gain protection only by secondary meaning.[68]

### 2. Composite trade names

■ Terms that are a combination of two or more types are called composite names. The proper analysis of a composite is to look at the name as a whole, not to dissect it into its component parts.[69] Thus, a composite generic-descriptive name may result in a protectable trade name.[70] The United States Supreme Court has stated the reason for this anti-dissection rule: "The commercial impression of a trade mark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety. . . ."[71] The anti-dissection rule is not violated, however, by separately analyzing the component parts as a step in making the ultimate determination of probable customer reaction to the composite as a whole.[72]

In *Self–Realization Fellowship Church v. Ananda Church of Self–Realization*, the Ninth Circuit applied the anti-dissection rule.[73] The court held that "Self–Realization" was generic for "a class of organization dedicated to spiritual attainment in the manner taught by Yoga," and descriptive (without secondary meaning) of books and tapes sold by such an organization.[74] In addition, the court noted that "Church" and "Fellowship" were generic in connection with a spiritual organization's name.[75] Thus, "Self–Realization," "Fellowship," and "Church" were not protectable individually as trade names or trademarks. However, the composites of "Self–Realization Fellowship" and "Self–Realization Fellowship Church" were potentially protectable as composites.[76] The Ninth Circuit ruled that the district court erred in concluding that the composites were unprotectable based upon the analysis of the component parts and remanded for consideration

---

**65.** See *Delaware & Hudson Canal Co. v. Clark*, 80 U.S. (13 Wall.) 311, 324, 20 L.Ed. 581 (1871) ("And it is obvious that the same reasons which forbid the exclusive appropriation of generic names or of those merely descriptive of the article manufactured and which can be employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of country. Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies.").

**66.** See *Gucci v. Gucci Shops, Inc.*, 688 F.Supp. 916, 928 (S.D.N.Y.1988) (resolving trademark dispute over use of Gucci family name).

**67.** See *L.E. Waterman Co. v. Modern Pen Co.*, 235 U.S. 88, 94, 35 S.Ct. 91, 59 L.Ed. 142 (1914) (affirming protection of the personal name trademark "Waterman" for pens).

**68.** "The known multiplicity of similar personal names may make consumers hesitant to assume a common source for products bearing a particular name. The name will therefore not function as a trademark or trade name unless, through use, it has become accepted by prospective purchasers as an indication of source or association with a particular person." Restatement (Third)

of Unfair Competition § 14, cmt. e (1995); *see also* 2 McCarthy, *supra* note 15, §§ 13:1–:3.

**69.** See *id.* § 11:27.

**70.** See *Association of Coop. Members, Inc. v. Farmland Indus., Inc.*, 684 F.2d 1134, 1140 (5th Cir.1982) ("The whole, in trademark law, is often greater than the sum of its parts. Common words in which no one may acquire a trademark because they are descriptive or generic may, when used in combination, become a valid trademark.").

**71.** See *Estate of P.D. Beckwith*, 252 U.S. at 545–46, 40 S.Ct. 414.

**72.** "It is perfectly acceptable to separate a compound mark and discuss the implications of each part thereof with respect to the question of descriptiveness provided that the ultimate determination is made on the basis of the mark in its entirety." *In re Hester Indus., Inc.*, 230 U.S.P.Q. 797, 798 n. 5 (T.T.A.B.1986).

**73.** 59 F.3d 902, 912–13 (9th Cir.1995).

**74.** *Id.* at 909–12.

**75.** See *id.* at 912.

**76.** See *id.* at 912–13.

as composite names.[77]

### 3. *"Fourth Avenue Theatre" is a composite descriptive name.*

The Aldermans argue that "Fourth Avenue Theatre" is not a distinctive name entitled to protection. They suggest that "Fourth Avenue Theatre" is a geographically descriptive name, and, without more, is not distinctive enough to warrant trade name protection. Iditarod does not dispute that "Fourth Avenue Theatre" is a descriptive name, arguing instead that the name has gained secondary meaning and is thus protectable.

"Fourth Avenue Theatre" is a composite name. "Fourth Avenue" is geographically descriptive. "Theater" is generic of a type of business. Looking at the whole, "Fourth Avenue Theatre" is still a descriptive name.[78] As a composite descriptive trade name, "Fourth Avenue Theatre" must have acquired a secondary meaning in the minds of consuming public to be entitled to protection against infringement.

### 4. *Secondary meaning generally*

Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source, and hence cannot be protected. However, descriptive marks may acquire the distinctiveness which will allow them to be protected under the Act. Section 2 of the Lanham Act provides that a descriptive mark that otherwise could not be registered under the Act may be registered if it "has become distinctive of the applicant's goods in commerce."

This acquired distinctiveness is generally called "secondary meaning." [79]

The North Carolina Supreme Court elaborated on the acquired distinctiveness called "secondary meaning":

When a particular business has used words *publici juris* for so long or so exclusively or when it has promoted its product to such an extent that the words do not register their literal meaning on the public mind but are instantly associated with one enterprise, such words have attained a secondary meaning. This is to say, a secondary meaning exists when, in addition to their literal, or dictionary, meaning, words connote to the public a product *from a unique source.*[80]

Thus, secondary meaning mainly concerns the mental association in buyers' minds between the trade name and a particular business.[81]

Secondary meaning refers to the meaning developed second in time.[82] The primary or original meaning of a name is the general understanding of the words before the trade name gained distinction. In this case, the original meaning of the words "Fourth Avenue Theatre" is a movie house located on Fourth Avenue in some city. Over time, the name "Fourth Avenue Theatre" may attain secondary meaning when consumers identify the name with the one specific, historic land-

---

**77.** *See id.* at 913; *see also California Cooler, Inc. v. Loretto Winery, Ltd.,* 774 F.2d 1451, 1455 (9th Cir.1985) ("California Cooler ... is a composite term, and its validity is not judged by an examination of its parts. Rather, the validity of a trademark is to be determined by viewing the trademark as a whole.... Thus, the composite may become a distinguishing mark even though its components individually cannot." (Citations omitted.)).

**78.** *See Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785, 787 (5th Cir.1984) (finding that name "Bank of Texas," which combined the generic term "bank" with the geographical term "Texas," was not inherently distinctive but could be protected as a trade name if it had acquired secondary meaning).

**79.** *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753 (citations omitted).

**80.** *Charcoal Steak House, Inc. v. Staley,* 263 N.C. 199, 139 S.E.2d 185, 187 (1964) (emphasis in original).

**81.** *See* 2 McCarthy, *supra* note 15, § 15:5.

**82.** *See Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 821 (9th Cir.1980); *Coca–Cola Co. v. Seven–Up Co.,* 497 F.2d 1351, 1354–55 (C.C.P.A. 1974) (secondary meaning is created second in time but becomes of "primary" importance in identifying source).

mark theater on Fourth Avenue in Anchorage.[83]

■ The more descriptive the term, the closer it is to a generic name, and the greater the evidentiary burden on the party attempting to prove secondary meaning.[84] Like all trade names, descriptive trade names fall on a spectrum of distinctiveness. Some terms are only slightly descriptive and need only a minimum quantum of evidence to prove secondary meaning. Other terms are highly descriptive and may need a substantial quantity of significant secondary-meaning evidence to be protectable as a trade name.[85]

In this case, "Fourth Avenue Theatre" is highly descriptive because the words alone describe a business and its location in common terms. The words could refer to any theater on Fourth Avenue. Accordingly, a substantial amount of evidence would be needed to prove secondary meaning.

■ Factors that support finding secondary meaning include both direct and circumstantial evidence. Direct evidence factors are consumer testimony and consumer surveys.[86] Circumstantial evidence factors include (1) exclusivity, length, and manner of use; (2) amount and manner of advertising; (3) amount of sales and number of customers; (4) established place in the market; and (5) proof of intentional copying.[87] Some courts add a sixth factor: unsolicited media coverage.[88] "[N]o single factor is determinative, and every element need not be proved." [89]

■ The party seeking to establish the trade name is not required to prove that the term is recognized as a trade name by all prospective purchasers in the relevant market nor even by a majority of them. Instead, secondary meaning exists if a "significant number of prospective purchasers" connect the term with a particular entity.[90] Many courts require only that a "substantial part" of the buying class makes such an association.[91]

5. *The jury finding that "Fourth Avenue Theatre" had acquired a secondary meaning was supported by the evidence.*

■ The Aldermans contend that the superior court erred as a matter of law in determining that "Fourth Avenue Theatre" was a trade name. Whether or not a symbol has acquired secondary meaning is a question of fact.[92] In this case, Iditarod has provided sufficient evidence—both direct and circumstantial—to support the jury finding of secondary meaning.

---

83. There is a territorial aspect of trade name protection that can be factored into a secondary meaning analysis. *See Lerner Stores Corp. v. Lerner*, 162 F.2d 160, 162–63 (9th Cir.1947) (discussing whether appellant established a "substantial nucleus of business" in the city where appellant sought to enjoin appellees use of trade name); *First Nat'l Bank v. First Wyo. Savs. & Loan Assoc.*, 592 P.2d 697, 702–04 (Wyo.1979) (affirming injunctive relief granted within county, but not statewide, based on area in which plaintiff had established secondary meaning); *Junior Food Stores, Inc. v. Jr. Food Stores, Inc.*, 226 So.2d 393, 396–97 (Fla.1969). For example, a theater in Juneau may be able to use "Fourth Avenue Theatre" without infringing Iditarod's trade name, if Iditarod could not establish that its secondary meaning—and thus any likelihood of confusion—extends to the Juneau area. Because the parties occupy neighboring businesses on the same street and in the same city, there is no need to determine the territorial extent of secondary meaning or trade name protection in this case.

84. *See American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 12 (5th Cir.1974).

85. *See* 2 McCarthy, *supra* note 15, § 11:26.

86. *See Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir.1989).

87. *See id.*

88. *See Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985).

89. *Id.* (internal quotations and citation omitted).

90. *See* 2 McCarthy, *supra* note 15, § 15:45; Restatement (Third) of Unfair Competition § 13, cmt. e (1995).

91. *See, e.g., Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991) (finding "substantial segment" sufficient for secondary meaning); *Levi Strauss*, 778 F.2d at 1358.

92. *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir.1987) ("Whether a particular trade dress has acquired secondary meaning is a question of fact subject to the clearly erroneous standard of review.").

■ Iditarod presented direct evidence of its trade name "Fourth Avenue Theatre" by the letters from its customers using that name. Evidence that buyers sent letters to a company with the trade name, rather than the corporate name, as the addressee tends to prove consumer association between the trade name and the corporate source.[93] In the instant case, Iditarod has presented three letters addressed to the "Fourth Avenue Theatre." This partially supports the jury's determination that "Fourth Avenue Theatre" has secondary meaning.

Three of the circumstantial evidence factors (exclusivity, length, and manner of use; established place in the market; and amount and manner of advertising) also support the finding of secondary meaning. The factor of exclusivity, length, and manner of use strongly favors Iditarod. The Fourth Avenue Theatre first opened around 1947. Even the Aldermans considered it to be a historic landmark in Anchorage. When Iditarod purchased the Fourth Avenue Theatre in 1991, it restored the theater to its original appearance and continued to use its original name.

The Fourth Avenue Theatre's established place in the market is shown by its appearance in newspapers and trade journals. Dictionaries, trade journals, magazines, and newspapers using a trade name to identify a business show that the business is commonly associated with that trade name. If the business is recognized by its trade name in professional circles, the buyer class is also likely to recognize the business by the trade name.[94] Here, Iditarod has presented substantial evidence showing the use of the trade name "Fourth Avenue Theatre" in newspapers and trade journals.

Advertising also helps support a finding of secondary meaning. Iditarod has provided substantial evidence of its advertising for the Fourth Avenue Theatre.

In sum, Iditarod presented ample direct and circumstantial evidence of secondary meaning.[95] We conclude that the jury verdict finding that the name "Fourth Avenue Theatre" had acquired secondary meaning was supported by the evidence.

### 6. Iditarod's trade name gained its secondary meaning prior to use by the Aldermans.

■ The general rule of priority for inherently distinctive trade names is that the first or senior user is entitled to legal protection.[96] Priority for inherently non-distinctive trade names like "Fourth Avenue Theatre" is more complex. Because rights by secondary meanings are gained solely by public recognition and association, the issue of priority and ownership is not which party first used the name, but which party first achieved secondary meaning in the trade name.[97] This would logically require a rule awarding priority to the party who was the first in a race to acquire secondary meaning. Instead, the rule has evolved to "an easier-to-apply, but stricter, surrogate test: the senior user must prove the existence of secondary meaning in

---

93. See Norsan Prods., Inc. v. R.F. Schuele Corp., 286 F.Supp. 12, 14 (E.D.Wis.1968).

94. See Food Fair Stores, Inc. v. Lakeland Grocery Corp., 301 F.2d 156, 161 (4th Cir.1962) (noting secondary meaning proven in part by food wholesalers and stock investors knowing of the association between trade name and company); Fund of Funds, Ltd. v. First Am. Fund of Funds Inc., 274 F.Supp. 517, 524 (S.D.N.Y.1967) (finding secondary meaning proven in part by mention of trade name in association with company in governmental publication read by professional investors).

95. Iditarod also provided supplier invoices as evidence of secondary meaning. In most cases, the relevant buyer class consists of actual or potential consumers, see 2 McCarthy, supra note 15, § 15:46, and the state of mind of persons who are not in this buyer class-like a business's suppliers-is often deemed irrelevant. See Invisible, Inc. v. National Broad. Co., 212 U.S.P.Q. 576, 577–78 (C.D.Cal.1980); Astatic Corp. v. American Electronics, Inc., 201 U.S.P.Q. 411, 421 (N.D.Ohio 1978). A supplier's use of a business's trade name rather than a corporate name may be due to nothing more than the business's stated preference. Thus, Iditarod's evidence of supplier invoices using the "Fourth Avenue Theatre" trade name adds little, if any, support to the jury finding.

96. See 2 McCarthy, supra note 15, § 16:4.

97. See id. § 16:34.

its mark at the time and place that the junior user first began use of that mark." [98]

■ Almost all of Iditarod's evidence of secondary meaning existed prior to the Aldermans' alleged first use. The Aldermans claim that they used the name "Fourth Avenue Theater Trolley Tours" in the fall of 1997. Only Iditarod's marginally relevant supplier invoices post-date the fall of 1997; the remainder of Iditarod's evidence of secondary meaning pre-dates the Aldermans' first use. Thus, the same evidence that strongly supports the finding of secondary meaning also supports a finding that the secondary meaning had developed before the Aldermans' first alleged use. We conclude that the jury verdict finding that the trade name "Fourth Avenue Theatre" belonged to Iditarod was supported by the evidence.

C. *The Aldermans' Use of the Name "Fourth Avenue Theater Trolley Tours" Infringed Iditarod's Trade Name.*

1. *Trade name infringement does not require direct competition.*

■ The Aldermans argue that there can be no likelihood of confusion unless there is competition. They correctly state that the trade name "Fourth Avenue Theatre" does not automatically protect all conceivable goods or services emanating from that business. The Aldermans then suggest that the scope of protection for the trade name is limited to goods or services already in existence.

This is wrong. Despite the terminology "unfair competition," the vast majority of modern decisions have adopted the rule that competition is not necessary between the parties for there to be a likelihood of confusion.[99] "Confusion, or the likelihood of confusion, not competition, is the real test of trademark infringement." [100]

There are four reasons for this broad protection of a trade name. First, protection from trade name use by non-competing businesses prevents placing the trade name holder's reputation in another's hands.[101] Second, it protects consumers from confusion.[102] Third, it allows a zone of natural expansion.[103] Fourth, it prevents unjust enrichment of the junior user—"reaping where one has not sown" and "riding the coat-tails" of the senior user.[104]

■ The related goods doctrine is the modern rule.[105] This doctrine extends trade name protection beyond businesses in direct competition to businesses that are related.[106]

---

**98.** *Id.; see also PaperCutter, Inc. v. Fay's Drug Co.,* 900 F.2d 558, 564 (2d Cir.1990); Restatement (Third) of Unfair Competition, § 19, Reporters' Note, cmt. b (1995) ("The party seeking relief ordinarily is required to establish the existence of secondary meaning at the time of commencement of use by the other party.").

**99.** *See* 4 McCarthy, *supra* note 15, § 24:13.

**100.** *Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857, 861 (5th Cir.1967).

**101.** *See Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 927 (8th Cir.1967) ("Plaintiff has the right to make and keep its own reputation without entrusting it to others over whom it cannot exercise any control. Some may treat it tenderly, nurture and enhance it, while others during the course of time may tarnish or degrade it; and the public is confused and suffers along with the infringed."); *James Burrough, Ltd. v. Ferrara,* 8 Misc.2d 819, 169 N.Y.S.2d 93, 96 (Sup.1957) ("It is not to be disputed that plaintiff is not required to put its reputation in defendant's hands, no matter how capable those hands may be.").

**102.** *See James Burrough, Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir.1976) ("What is infringed is the right of the public to be free of confusion and the synonymous right of a trademark owner to control his product's reputation.").

**103.** This reason is not decisive because it is offset by the desire to prevent giving the senior user a monopoly over the name. *See S.C. Johnson & Son, Inc. v. Johnson,* 175 F.2d 176, 180 (2d Cir.1949) (stating that the court would not allow plaintiff to "reach a choking hand into a market not its own," unless there was a very strong showing of probable expansion or the plaintiff's mark was very strong).

**104.** *Stork Restaurant v. Sahati,* 166 F.2d 348, 357 (9th Cir.1948).

**105.** *See* 4 McCarthy, *supra* note 15, §§ 24:5–:6.

**106.** *Compare Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2d Cir.1928) (finding likely confusion between Yale locks and Yale flashlights), *Aunt Jemima Mills Co. v. Rigney & Co.,* 247 F.

"The [junior's] use need not be the same as, nor one in competition with, the original use in order to infringe." [107] Instead, the junior's use will infringe if it is likely to cause consumer confusion.

### 2. Likelihood of confusion generally

"Likelihood of confusion" is the basic test of both common-law trademark infringement [108] and federal statutory trademark infringement.[109] State statutes modeled after the Lanham Act also use the same likelihood-of-confusion test.[110]

The test has been stated in these terms: An appreciable number of reasonable buyers must be likely to be confused by the names for trade name infringement or unfair trade practice liability.[111] "Appreciable number" escapes a numerical value, but most courts find that a majority of confused customers is not needed. Some courts have found survey evidence of even low percentages of actual

confusion to be strong evidence of a likelihood of confusion.[112] "Likely" has been interpreted as synonymous with probable, but not merely possible, confusion.[113]

"Confusion" is a broad concept. Many courts have recognized not only point-of-sale confusion, but also post-sale confusion, pre-sale confusion, and even reverse confusion (where the junior user's advertising swamps the market and consumers are likely to think that the senior user's goods or services are those of the junior).[114] Also, "confusion" is not limited to confusion as to the source of goods or services; "confusion" includes confusion as to "affiliation, connection, or association." [115]

The relevant class of people is purchasers and potential customers.[116] Both the senior and junior users' customers should be considered.[117] "Brand indifferent" customers

407, 409–10 (2d Cir.1917) (finding likely confusion between Aunt Jemima pancake syrup and Aunt Jemima pancake flour), and *Time, Inc. v. Life Television Corp.*, 123 F.Supp. 470, 475 (D.Minn.1954) (finding likely confusion between Life magazine and Life television sets because Life magazine endorsed various products), *with Time, Inc. v. T.I.M.E., Inc.*, 123 F.Supp. 446, 456–57 (S.D.Cal.1954) (finding no likely confusion between Time magazine and T.I.M.E. trucking service).

**107.** *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir.1963); *accord AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir.1979).

**108.** *See McLean v. Fleming*, 96 U.S. 245, 255, 24 L.Ed. 828 (1877) ("Where the similarity is sufficient to convey a false impression to the public mind, and is of a character to mislead and deceive the ordinary purchaser in the exercise of ordinary care and caution in such matters, it is sufficient to give the injured party a right to redress....").

**109.** *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("It is, of course, also undisputed that liability under [the Lanham Act] requires proof of the likelihood of confusion.").

**110.** *See* 3 McCarthy, *supra* note 15, § 23:1, n. 1, & n. 7.

**111.** *See id.* § 23:2.

**112.** *See, e.g., Exxon Corp. v. Texas Motor Exch., Inc.*, 628 F.2d 500, 507 (5th Cir.1980) (finding

fifteen percent level of confusion is "strong evidence" of likely confusion); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F.Supp. 707, 716 (S.D.N.Y.1973) (stating that survey evidence, including a survey showing eight and one-half percent confusion, was "strong evidence" of a likelihood of confusion).

**113.** *See American Steel Foundries v. Robertson*, 269 U.S. 372, 384, 46 S.Ct. 160, 70 L.Ed. 317 (1926); *Elvis Presley Enters. Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir.1998) ("Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion.").

**114.** *See* 3 McCarthy, *supra* note 15, § 23:5.

**115.** AS 45.50.471(b)(3); 15 U.S.C. § 1125(a); *see Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir.1996) ("The relevant question is whether a golfer, albeit sophisticated, would likely be confused about affiliation between the two clubs [both named 'Champions'].").

**116.** *See Electronic Design & Sales, Inc. v. Electronic Data Sys. Corp.*, 954 F.2d 713, 716 (Fed. Cir.1992) ("[T]he inquiry generally will turn on whether actual or potential 'purchasers' are confused.").

**117.** *See Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 995 (2d Cir.1987) (concluding that the district court erred by considering likelihood of confusion among only the junior user's customers).

are not relevant to the likelihood-of-confusion determination.[118]

■ In determining infringement of a trade name, the court must take into account the goods and services of the contesting companies. Goods-related factors are important to consider in determining infringement of a trade name by another's use of a trade name. "The trade name interests that [the senior user] seeks to protect relate to the quality and reputation of the *goods* it produces [or the services it provides]." [119]

■ There are at least three ways to prove a likelihood of confusion: (1) survey evidence; (2) evidence of actual confusion; or (3) argument based on a clear inference arising from a comparison of the conflicting marks and the context of their use.[120] While not required, actual confusion is a powerful indicator of a likelihood of confusion.[121] "There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." [122]

■ The factors used to determine the likelihood of confusion vary from court to court, but most courts appear to have derived their tests from the factors listed in the Restatement of Torts.[123] The factors considered by the Ninth Circuit are:

1. strength of the mark;
2. proximity of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. type of goods and the degree of care likely to be exercised by the purchaser;

7. defendant's intent in selecting the mark; and
8. likelihood of expansion of the product lines.[124]

In the instant case, the trial court used a six-factor test in its instructions to the jury:

Likelihood of confusion is also determined by evaluating the following factors:

(1) the degree of similarity of the names;
(2) the manner and method in which the plaintiff and defendant used the names;
(3) the strength of the name, "4th Avenue Theatre";
(4) the length of time the parties used the names without evidence of actual confusion;
(5) the intent of a party in adopting the name, "Fourth Avenue Theater," that is, whether there was an intent to confuse;
(6) other factors about the name, "Fourth Avenue Theater" that would tend to reduce any tendency to confuse the purchaser about the source or origin of the trolley service

This formulation is not erroneous. While the tests are similar, the Ninth Circuit test is preferable because it is more comprehensive and well developed by case law.

3. *The jury finding of a likelihood of confusion was supported by the evidence.*

■ "The jury's finding on the likelihood of confusion issue is factual and must be affirmed if it was based on substantial evidence...." [125] The jury found that "Fourth

---

**118.** 3 McCarthy, *supra* note 15, § 23:5; *see also Sleekcraft*, 599 F.2d at 353.

**119.** *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir.1989).

**120.** *See* 3 McCarthy, *supra* note 15, § 23:2.1; *see also Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 612 (7th Cir.1965) (noting importance of evidence of actual confusion); *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 504 (8th Cir.1987) ("Visual inspections by the court are permissible as an aid in determining likely confusion. However, caution should be exercised to avoid putting too much stock in a subjective inspection done in-cham-

bers that is devoid of market characteristics." (Citation omitted.)).

**121.** *See Tisch Hotels*, 350 F.2d at 612.

**122.** *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971).

**123.** Restatement of Torts §§ 729 & 731 (1938).

**124.** *Sleekcraft*, 599 F.2d at 348–49.

**125.** *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973 (11th Cir.1983) (citations omitted); *accord Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013–14 (9th Cir.1985).

Avenue Theatre" would likely be confused with "Fourth Avenue Theater Trolley Tours." Substantial evidence supports this finding.[126]

■ Regarding the strength of the trade name, Iditarod presented substantial evidence of secondary meaning.[127] The stronger the evidence of secondary meaning, the stronger the mark, and the greater the scope of protection because confusion is more likely.[128] This evidence of secondary meaning supports the jury's finding.

Other evidence shows that both Iditarod and the Aldermans provided tourist attractions that operated side-by-side. The similarities between their businesses indicate the danger that consumers will mistakenly assume an association between related businesses.[129]

The evidence also shows that the disputed trade names are similar in sight, sound, and meaning.[130] Here, "Fourth Avenue Theatre" is exactly the same as the first part of the name "Fourth Avenue Theater Trolley Tours." The addition of the descriptive "Trolley Tours" does not avoid a likelihood of confusion.[131]

Evidence of actual confusion also strongly supports a finding of likely confusion. Both sides acknowledge that once Iditarod started its trolley service, there was actual consumer confusion.

Iditarod also presented evidence that the Aldermans intentionally infringed the trade name. The evidence shows that the Aldermans registered the name "Fourth Avenue Theater Trolley Tours" soon after the falling out with Iditarod and selected a trolley parking spot partially in front of the theater.

Because this evidence raises the inference that the Aldermans intentionally infringed Iditarod's trade name, it also supports the jury finding.

Finally, Iditarod proved a likelihood of expansion when it presented evidence that it launched its own trolley tour business in the spring of 1998. We conclude that the jury's finding of likely confusion was amply supported by the evidence.

D. *The Trial Court Correctly Interpreted AS 10.35.040 to Require Prior Use for Valid Registration of a Business Name and Properly Denied Summary Judgment That the Aldermans Had Made Prior Use of the Name "Fourth Avenue Theater Trolley Tours."*

■ The Aldermans argue that the trial court erred by denying their motion for summary judgment that registration of the business name "Fourth Avenue Theater Trolley Tours" gave them exclusive right to use that name. The trial court concluded that AS 10.35.040 required prior use of the name for valid registration and found that the Aldermans had admitted in their answer that they had made no prior use of the name at the time it was registered. First, the Aldermans contend that the trial court erred by denying summary judgment both legally by misinterpreting AS 10.35.040 and factually by finding on summary judgment that they had not used the name prior to registration. Second, they argue that the court erred when instructing the jury.

Alaska Statutes 10.35.010–.500 provide procedures for reserving and registering business names. At the time relevant in this

---

126. We note that the trade name "Fourth Avenue Trolley Tours" would have a different analysis and may have resulted in a finding of no likelihood of confusion because that name lacked reference to the theater. However, this name was not contested by Iditarod and was not decided at trial.

127. *See supra* Part IV.B.5.

128. *See Levi Strauss,* 632 F.2d at 821; *Sleekcraft,* 599 F.2d at 349 n. 12.

129. *See Sleekcraft,* 599 F.2d at 350.

130. *See id.* at 351.

131. *See, e.g., Bellbrook Dairies, Inc. v. Hawthorn Mellody Farms Dairy, Inc.,* 45 C.C.P.A. 842, 253 F.2d 431, 432 (1958) ("[O]ne may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter."); *American Express Co. v. American Express Limousine Serv. Ltd.,* 772 F.Supp. 729, 733 (E.D.N.Y. 1991) (finding that the addition of "Limousine Service" to the American Express mark actually increased a likelihood of confusion).

case, former AS 10.35.040 covered the registration of a business name,[132] while former AS 10.35.020 covered the reservation of a business name.[133]

The Aldermans first note that trademark law protects a prior user of a trade name. They then contend that if prior use of a business name were required for registration, the exclusive right to use the name conveyed by statute would be redundant with common law trademark rights. Because requiring prior use makes the statute redundant, the Aldermans argue that such an interpretation must be incorrect.

We first note that the text of former section .040 stated that "[a] person *conducting a business* may register its name." [134] In contrast, former section .020 applied to reserving a business name "by a person intending to start a business." The plain meaning of these two statutes is as follows: former section .020 applied to reserving a name for a new business, and former section .040 applied to registering a name for an existing business—in other words, a business name with prior use.[135]

■■■ We do not stop at the plain meaning of the statute, however; we also consider legislative history in our sliding scale approach to statutory interpretation.[136] In order to interpret a statute contrary to its plain meaning, "the plainer the language, the more convincing contrary legislative history must be." [137] In this case, the Aldermans have not presented, nor have we found, any legislative history indicating that section .040 was intended to allow registration of new business names.

The Department of Community and Economic Development, which administers business name registration, agreed. The department's publicly available instructions interpreted business name registration under former AS 10.35.040:

> Unlike a name reservation, in order to register a business name, a person must be "transacting business" under the name being registered. Transacting business means that the name is used in advertising, on accounts of record, on licenses and permits, stationery, or similar means of publicly identifying the name of a company.

In other words, according to the interpretation of the agency administering the statute, registering a business name under former AS 10.35.040 required the applicant to be transacting business under the name, while reserving a business name under former AS 10.35.020 did not require such prior use. Because AS 10.35.040 plainly required prior use and no legislative history exists to the contrary, we hold that the trial court correctly

**132.** The state legislature has recently amended AS 10.35.020 and .040. *See* ch. 50, §§ 17–19, SLA 1999; ch. 115, § 5, SLA 2000. Former AS 10.35.040 stated the rule for registering a business name:

> A person conducting a business may register its name if the name is not the same as, or deceptively similar to, the name of a domestic corporation or a foreign corporation authorized to transact business in the state, or a name reserved or registered under this title. Registration of the name gives the exclusive right to the use of the name and the person who has registered the name may enjoin the use of the same name or a deceptively similar name and has a cause of action for damages against anyone who uses the same name or a deceptively similar name.

**133.** Former AS 10.35.020 stated the rule for reserving a name for a new business:

> Reservation of a business name is made by filing an application with the commissioner. Upon finding that the name is available for business use, the commissioner shall reserve it

for the exclusive use of the applicant for a period of 120 days. A name is not available which is the same as, or deceptively similar to, the name of a domestic corporation or a foreign corporation authorized to transact business in the state, or a name reserved or registered under this title or gives the impression that the business is incorporated.

**134.** Former AS 10.35.040 (emphasis added).

**135.** The Aldermans did not attempt to reserve the name under AS 10.35.020. On their registration form, the Aldermans checked the box to register a business name; they did not check the box to reserve a name.

**136.** *See Romann v. State, Dep't of Transp. & Pub. Facilities,* 991 P.2d 186, 190 (Alaska 1999).

**137.** *State v. Alex,* 646 P.2d 203, 208–09 n. 4 (Alaska 1982) (quoting *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir. 1973)).

interpreted AS 10.35.040 to require prior use for valid registration of a business name.

■ We note that granting "exclusive use" of a business name to a junior user, but first registrant, allows the junior user to usurp the business name of a senior, but unregistered, user. The majority rule is that administrative acceptance of a corporate name by a state agency will be given no judicial weight in litigation over rights to the name,[138] reasoning that "a state [does not intend] to license the commission of what would otherwise be a tortious act" simply by allowing registration under its laws.[139] However, AS 10.35.040 is different from most states' registration statutes because it expressly grants a right to "exclusive use" of a business name and lists remedies of injunction and damages. In any event, we need not resolve today this conflict between the exclusive right to a business name by registration or reservation under AS 10.35.010–.500 and the right to protect a trade name against unfair competition under AS 45.50.471, because the Aldermans were not entitled to summary judgment that they made prior use of the trade name "Fourth Avenue Theater Trolley Tours" as required for valid registration.

The Aldermans argue that the trial court erred in finding on summary judgment that they had not used the business name prior to registration. They claim that they were using the name prior to registration and that they presented substantial testimony of prior use at trial. The Aldermans' testimony, however, was presented only after summary judgment was denied. At summary judg-ment, the only evidence concerning prior use was the Aldermans' denial of prior use made in their answer to the complaint. Based on the evidence before the trial court at summary judgment, the trial court did not err in denying the Aldermans' motion.

The Aldermans also argue that the trial court's instruction to the jury on AS 10.35.040 was erroneous. After the Aldermans testified at trial to prior use of the trade name, the trial court recognized that the Aldermans' prior use was a question of fact for the jury. The trial court instructed the jury on AS 10.35.040 with the same interpretation it had applied at summary judgment—valid registration required prior use. Because the trial court's interpretation on summary judgment was correct, the trial court's jury instruction was likewise correct.

E. *It Was an Abuse of Discretion to Allow Iditarod To Amend the Pleadings To Include a Cause of Action for Breach of Contract after the Close of Evidence.*

After the close of evidence, the trial court allowed Iditarod to amend its complaint to add a cause of action for breach of contract. The court reasoned that amendment was proper because evidence of the contract's existence and terms had been presented by both parties. We review a trial court's decision to permit amendment of the pleadings for an abuse of discretion.[140]

The Aldermans contend that whether the judge allowed amendment under Alaska Civil Rule 15(a) or 15(b),[141] amendment of the

---

138. *See* 1 McCarthy, *supra* note 15, § 9:8; *see, e.g., MacPhail v. Stevens,* 41 Colo.App. 99, 586 P.2d 1339, 1341 (1978) (holding that compliance with registration statute did not abrogate common law and statutory trademark law).

139. *Powder River Oil Co. v. Powder River Petroleum Corp.,* 830 P.2d 403, 407 (Wyo.1992).

140. *See Betz v. Chena Hot Springs Group,* 742 P.2d 1346, 1348 (Alaska 1987).

141. Alaska R. Civ. P. 15 provides:
(a) Amendments. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires....
(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

pleadings is improper when prejudicial to the party opposing amendment, citing *Betz v. Chena Hot Springs Group*[142] and *Federal Practice and Procedure* § 1493.[143] They argue that they were prejudiced by the amendment of the pleadings and that the trial court therefore abused its discretion.

Iditarod contends that *Betz* does not apply because the judge allowed amendment according to Rule 15(b), not 15(a). In addition, Iditarod argues that the Aldermans impliedly consented to the new issue by counterclaiming for breach of the covenant of good faith and fair dealing, failing to object when evidence on the new issue was presented, and presenting evidence relevant to the new breach of contract claim.

The trial court did not specify whether it granted the amendment of the pleadings under Civil Rule 15(a) or 15(b). Either could apply. Rules 15(a) and 15(b) substantially overlap, and there is no strong textual basis for concluding that only Rule 15(b) applies to amendments made during or after trial.[144] Prejudice to the opposing party is an important consideration under either section of the rule.[145] We conclude that the Aldermans were prejudiced by the inability to present evidence as to the amount of rent due (fifteen percent of the tickets sold at the Fourth Avenue Theatre) because the trial court allowed amendment of the pleadings after the close of evidence. Accordingly, under either Civil Rule 15(a) or (b), the trial court abused its discretion.

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

**142.** 742 P.2d 1346, 1349–50 (Alaska 1987).

**1.** *Amendment of the pleadings under Civil Rule 15(a) was improper because the prejudice to the Aldermans outweighed the hardship to Iditarod.*

■■■ For amendment under Civil Rule 15(a), we have instructed that the trial court "must apply a balancing test to decide whether the amendment should be granted, weighing the degree of prejudice to the opposing party against the hardship to the movant if the amendment is denied."[146] A trial court may also deny amendment when it is unduly delayed, offered in bad faith, or futile.[147]

Iditarod's attempt to amend the pleadings to include the breach of contract claim was unduly delayed. In October 1997 Iditarod knew that the Aldermans had failed to pay rent according to the lease agreement, well before it filed its complaint against them in June 1998. While we have stated that delay alone is an insufficient basis upon which to deny a motion to amend,[148] this weighs against allowing the amendment.

The Aldermans argue that they were prejudiced by the amendment at the close of evidence because at that point it was too late to present evidence that their rent agreement provided that they would pay fifteen percent of trolley tour ticket sales from the Fourth Avenue Theatre, not fifteen percent of their gross revenues. But the Aldermans admit that they both testified at trial that the rent agreement was for fifteen percent of sales from the theater ticket booth. The trial judge correctly found that both sides had actively litigated the issue. And in fact, the way the special verdict was worded, there was apparent agreement that the con-

**143.** 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1493 (2d ed.1990).

**144.** *See id.*, § 1488.

**145.** *See Betz*, 742 P.2d at 1348–50; 6A Wright, Miller & Kane, *supra* note 143, § 1493.

**146.** *Betz*, 742 P.2d at 1348 (quoting *Shooshanian v. Wagner*, 672 P.2d 455, 458 (Alaska 1983)).

**147.** *See id.* (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

**148.** *See id.*

tract was for fifteen percent of the revenues from trolley tour tickets sold at the Fourth Avenue Theatre in 1997. Because the jury apparently adopted the Aldermans' version of the contract, they were not prejudiced by their inability to present additional evidence on the *terms* of the contract.

But the Aldermans also argue that they were prejudiced because the jury had no way to determine appropriate damages from the evidence actually presented. They note that the only evidence of their revenues presented to the jury was gross revenues, which did not separate out the revenues generated at the Fourth Avenue Theatre from those revenues generated elsewhere. Thus, although the jury found that the contract terms were for fifteen percent of revenues generated by ticket sales at the theater, the jury could only, and did, make an award based on the Aldermans' gross revenues from all sales. Our review of the record supports the Aldermans' claim that the evidence contained no breakdown of the gross revenues between ticket sales at the Fourth Avenue Theatre and all other sales. The inability to present this evidence substantially prejudiced the Aldermans.

The hardship to Iditarod did not outweigh the prejudice to the Aldermans. If the amendment had not been permitted, Iditarod may still have been able to collect its unpaid rents.[149] In any event, Iditarod's hardship is caused by its own lack of diligence. Thus, the trial court erred by allowing amendment of the pleadings after the close of evidence under Civil Rule 15(a).

> 2. *Amendment of the pleadings under Civil Rule 15(b) was improper because the Aldermans did not impliedly consent to litigation of the breach of contract issue.*

 Analysis of Rule 15(b)[150] amendment of the pleading is slightly different.

Application of this rule is appropriate in two general situations: when evidence supporting the amendment was offered at trial (1) with the opposing party's express or implied consent, or (2) over the opposing party's objection that the evidence is not within the issues raised by the pleadings.[151] In determining implied consent, prejudice to the party opposing amendment is relevant.[152]

The Aldermans neither expressly consented to the amendment nor did they object to Iditarod's presentation of the evidence. Thus, the only way amendment of the pleadings would have been appropriate under Rule 15(b) is if the Aldermans had impliedly consented to litigating the breach of contract issue.

Professors Wright, Miller, and Kane explain Rule 15(b)'s concept of implied consent: "Implied consent ... is ... difficult to establish and seems to depend on whether the parties recognized that an issue not presented by the pleadings entered the case at trial. If they do not, there is no consent and the amendment cannot be allowed."[153]

The Aldermans apparently failed to recognize that breach of contract was at issue in the trial. They did not offer any evidence of appropriate damages according to their interpretation of the contract—revenues of ticket sales from the Fourth Avenue Theatre. While the Aldermans did offer evidence of their interpretation of the contract terms and of their total revenues from all sources, introduction of evidence does not indicate implied consent where the evidence offered is relevant to issues already in the case.[154] Because the evidence was relevant to the Aldermans' counterclaims and Iditarod's claim for trade name infringement damages, the Aldermans' introduction of evidence did not show implied consent.

In sum, neither Rule 15(a) nor Rule 15(b) provides appropriate grounds for granting

---

149. Under certain circumstances, a party denied the opportunity to amend the pleadings to conform to the evidence may bring a separate action to seek relief. *See Hake v. Gunter*, 824 F.2d 610, 616–17 (8th Cir.1987).

150. *See supra* note 141.

151. *See* 6A Wright, Miller & Kane, *supra* note 143, § 1491.

152. *See id.* § 1493.

153. *Id.* (footnote omitted).

154. *See id.*

amendment of the pleadings after the close of evidence in this case. Accordingly, we vacate the award for breach of contract.

### F. The Trial Court Did Not Abuse Its Discretion in Awarding Attorney's Fees to Iditarod.

The Aldermans contend that the trial court erred in applying Rule 82(b)(2) as a matter of law. They further argue that the trial judge abused his discretion in granting attorney's fees because Iditarod waived its right to seek fees.

#### 1. The trial court did not abuse its discretion by allowing Iditarod seventy days to file a corrected motion for attorney's fees.

The Aldermans argue that Iditarod's failure to timely file its corrected motion for Rule 82 attorney's fees waived its claim. Iditarod contends that its original defective motion was timely and the trial judge allowed it unspecified additional time to correct; thus, its second motion was also timely.[155]

Rule 82(c) establishes the time limits for filing a motion for attorney's fees:

> Failure to move for attorney's fees within 10 days, or such additional time as the court may allow, shall be construed as a waiver of the party's right to recover attorney's fees.[156]

The trial court distributed its judgment on July 26, 1999; Iditarod timely filed its original motion for attorney's fees on August 5. The question is whether the trial court abused its discretion by allowing Iditarod seventy additional days to file its second motion. We have not yet interpreted the phrase "or such additional time as the court may allow."[157]

Rule 82(c) gives the court discretion to allow additional time for filing a motion for attorney's fees. Prior to the adoption of the current version of Rule 82, we held that the trial court had discretion to allow motions for attorney's fees within a reasonable amount of time.[158] In *T & G Aviation v. Footh,* we held that a motion filed seventy days after final judgment was within a reasonable amount of time.[159] Here, Iditarod filed its corrected motion seventy days after the first motion was denied without prejudice. The delay was not as serious as in *T & G Aviation* because Iditarod timely filed its initial motion.

The Aldermans urge us to adopt the *T & G Aviation* dissent's view. But even if we did, it would be to no avail. The dissent argued that, without persuasive explanation of further delay, thirty days should be the outside limit of reasonableness. A losing party has thirty days to decide to appeal; a delay of more than thirty days in filing for attorney's fees may be prejudicial to the losing party if the losing party bases its decision to appeal on the size of an adverse award of attorney's fees.[160] This rationale, however, does not directly apply if the losing party decides to appeal without considering the possible adverse award of attorney's fees. Here, the Aldermans filed their appeal on August 18. They did not wait for the trial court's decision regarding attorney's fees. Thus, the allegedly tardy motion for attorney's fees did not prejudice the Aldermans' decision to appeal.

Because a seventy-day delay is not unreasonable after the filing of a timely motion and because the Aldermans were not prejudiced by the delay, we conclude that it was within the trial court's discretion to allow the delay.

#### 2. The trial court did not err as a matter of law by applying Rule 82(b)(2).

The Aldermans contend that award of attorney's fees under Rule 82(b)(2) was

---

155. Iditarod incorrectly counts forty-three days between August 26, the date of the trial court's denial of Iditarod's first motion for fees, and November 4, the date Iditarod's corrected motion was signed. The actual number of days is seventy.

156. Alaska R. Civ. P. 82(c).

157. *Id.* This version of Rule 82(c) was adopted in 1995.

158. *See T & G Aviation, Inc. v. Footh,* 792 P.2d 671, 672 (Alaska 1990).

159. *See id.*

160. *See id.* (Matthews, C.J., dissenting).

improper because Iditarod obtained a money judgment—$13,924.05 for the Aldermans' breach of contract. According to the Aldermans, Iditarod is entitled to attorney's fees based upon a percentage of the amount of the judgment under Rule 82(b)(1), not the actual amount of attorney's fees.

Iditarod responds that the main issue in the litigation was the trade name infringement and that there was no money judgment on that issue. Iditarod extrapolates from the rule that the prevailing party is determined by success on the main issue to a proposed interpretation of Rule 82(b) that the determination of whether a money judgment was recovered is based only on the award, or lack, of a money judgment on the main issue.

We need not reach the issue. Because we vacated the monetary judgment for breach of contract in light of the erroneous amendment of the pleading after the close of evidence, the Aldermans' argument is rendered moot. After we vacate the breach of contract award, only the trade name issues remain. Iditarod is the prevailing party on the trade name issues and, by this decision, recovers no money judgment. Whether the trial court properly applied Civil Rule 82(b)(2) is moot; undoubtedly Rule 82(b)(2) applies now.

> 3. *Iditarod did not waive its claim to an enhanced attorney's fee award because it did not request an enhanced award in its original motion.*

 The Aldermans argue that because Iditarod did not ask for an enhanced attorney's fees award in its original defective motion for attorney's fees, it waived any claim to an enhanced fees award under Rule 82(b)(3). Iditarod argues that the trial judge did not place any restrictions upon the amount of fees Iditarod could request in a revised motion.

The trial judge denied Iditarod's initial motion for attorney's fees stating, "This denial is without prejudice to its right to re-apply and make the appropriate showing." Black's Law Dictionary defines "without prejudice" as follows: "Where ... a motion is denied ... 'without prejudice,' it is meant as a decla-

ration that no rights or privileges of the party concerned are to be considered as thereby waived or lost, except in so far as may be expressly conceded or decided." [161] The trial judge made no express limitations on Iditarod's ability to re-apply. The trial court's denial without prejudice effectively declared that none of Iditarod's rights to attorney's fees were considered waived or lost. Thus, Iditarod did not waive its right to move for an enhanced award in its subsequent motion for attorney's fees, and the trial court did not abuse its discretion in considering and granting an enhanced attorney's fees award.

## V. CONCLUSION

Because the trial court correctly applied trade name law and the jury verdict was supported by the evidence, we AFFIRM the judgment that the Aldermans infringed Iditarod's trade name "Fourth Avenue Theatre." We also AFFIRM the trial court's interpretation of AS 10.35.040. Because the Aldermans were substantially prejudiced by the amendment of the pleading after the close of evidence, we REVERSE the trial court's grant of the motion to amend the pleadings and VACATE the award for the added breach of contract claim. Finally, we AFFIRM the trial court's award of attorney's fees.

---

161. *Black's Law Dictionary* 1179 (6th ed.1990).