*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DAVID B. FLETCHER, | ) |
| | ) Supreme Court No. S-16508 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-14-05223 CI |
| v. | ) |
| | ) O P I N I O N |
| LINDA FLETCHER, n/k/a Linda | ) |
| Occhipinti, | ) No. 7318 – November 30, 2018 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Mario L. Bird, Ross, Miner & Bird, PC, Anchorage, for Appellant. David S. Houston, Houston & Houston, PC, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.
STOWERS, Chief Justice, dissenting in part.

## I. INTRODUCTION

The primary issues in this divorce case are whether the superior court abused its discretion by determining the parties' separation date and erred by dividing the marital estate 50/50. For the reasons that follow, we answer "no" to the former and "yes" to the latter.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Linda and David Fletcher were married in 1990. They have three children, one of whom was a minor at the time of their 2015 divorce trial. The parties dispute their separation date: Linda argues it was in 2010, when David physically moved out of the house and began living in his truck; David argues it was in 2014, when Linda filed for divorce.

### 1.    Domestic violence; David moves out of the house

Linda twice petitioned for domestic violence protective orders against David during the marriage, first in 2001 and again in 2010. Both petitions were granted. David moved out of the marital home and into his truck around the time Linda filed the second petition in February 2010. Although David came to the house to pick up his mail, see the children, and do repair and improvement projects (some of which Linda testified she did not request), he did not live or sleep in the house again.

### 2.    Linda's and David's employment and finances

During the marriage Linda worked in the legal administrative field, and David worked through the International Brotherhood of Electrical Workers (IBEW) local union hall as an electrical contractor and an electrician. Linda handled the parties' finances. They ceased maintaining a joint bank account a couple of years into the marriage, and in 2001 separately filed bankruptcy declarations "due to debts arising from David's business." Linda paid the family's monthly expenses and invoiced David each month for his share of the costs to feed, clothe, and house the family. She also paid and invoiced David for his expenses, including car insurance. Linda testified that in 2010, after David moved out of the marital home, they agreed he would pay $1,200 per month for his share of the family expenses. David made these payments sporadically and in

installments until 2012, when he instead "made multiple direct and indirect payments to Linda and/or to/for the children."

The parties obtained the marital home in 2002 through a foreclosure sale; it was purchased in Linda's name only, and the loan was in her name only. David made major improvements to the home. Linda refinanced the property in 2012; David testified that he had to sign documents "even though [he] wasn't living in the house." The parties agreed the home was marital property.

### 3. David's health; insurance

David was diagnosed with type II diabetes in 1992. He has since suffered two heart attacks and a stroke; he had surgery related to the first heart attack. David takes between 17 and 20 medications daily.

Until 2007 the family had health insurance through Linda's employer. Linda then switched the children's healthcare to Alaska Native Tribal Health Consortium (ANTHC) and dropped David from her employer's insurance plan. David had access to health insurance through IBEW, but he could not rely on coverage because he was not always able to maintain the required minimum number of hours worked each week. According to one of David's attorneys, David would qualify for Medicare in January 2017, two years after trial.

### B. Proceedings

Linda filed for divorce in February 2014, alleging a February 2010 separation date. David admitted to the February 2010 separation date when he filed his answer, but he later argued in his pretrial brief and at trial that the February 2014 divorce filing should be the separation date.

Trial was held over five days in the summer of 2015, and it was continued for a month due to David's medical issues. When requesting the continuance, David's counsel also began arguing that the February 2010 separation date admission in David's

answer had been amended to conform to the evidence presented at trial. The superior court did not hear complete argument on this issue and did not expressly rule on this issue at that time or later in its findings; the issue was not addressed again by either party during trial.

In December 2015 the superior court issued a divorce decree and supplemental findings of fact and conclusions of law. The court determined that, "[a]lthough a close call," the separation date was February 2010, finding "[a]s of that date, the parties moved away from being an 'economic unit' or in any other sense a married couple, and . . . they have never reversed that course."

The superior court also considered the AS 25.24.160(a)(4) property division factors (the *Merrill* factors)[1] and made relevant findings. At the time of trial Linda was 52 and David was 62; Linda was in "better health," and "David's health [was] quite poor." Linda was employed as a billing manager in a local law firm, and her future income was secure; she had about $6,000 in savings; she had two retirement accounts, one a marital IRA valued at about $87,000 and the other a non-marital 401(K) valued around $178,000; and she had health insurance through her employer and ANTHC. David was medically retired and receiving Social Security disability; he had two pension accounts, both marital; he had about $1,200 in savings; and he would have to pay for healthcare until 2017, when he would become eligible for Medicare. The court also found that Linda cared for the couple's minor daughter in the family home and received child support from David's Social Security disability benefits; and that David lived in his truck, but would soon have an opportunity to live in a friend's house for 18 months at $600 per month. Determining there was "no reason to depart from the 50[/]50

---

[1]      *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

presumption" property division, the court awarded Linda the marital home and ordered her to make an equalization payment of about $72,000 to David.

After both parties timely moved for reconsideration, the superior court issued amended supplemental findings of fact and conclusions of law in May 2016. The court once again considered the *Merrill* factors and determined that, although a "close call," it would not depart from the presumptively 50/50 property division.

The parties appeared before the superior court in June to argue whether David should retain Linda's half of his monthly pension payments until the equalization payment she owed him was extinguished or whether David's pension should be split 50/50 via Qualified Domestic Relations Order (QDRO). The court issued an order immediately entitling David to half of Linda's marital IRA and directed the parties to determine whether Linda's equalization payment to David would be made in a lump sum, with his pension payments then split equally, or whether he would retain his pension payments in full until Linda's equalization payment was offset. The court "again considered the *Merrill* factors" and found that, but for the changes regarding Linda's marital IRA, "th[e] court's *Merrill* findings remain[ed] unchanged."

Linda then moved for reconsideration or clarification, and David filed a cross-motion for relief from judgment. David argued that his medical condition had worsened due to kidney disease, constituting newly discovered evidence sufficient to merit reconsideration of the 50/50 property division. The superior court ordered half of Linda's marital IRA transferred to David within ten days, executed QDROs dividing his pension payments, and ordered her to pay the balance of the equalization payment in full by refinancing the marital home. The court denied David's cross-motion, reasoning that it had known of his extensive health issues and had properly balanced the parties' health when weighing the *Merrill* factors and allocating the marital estate 50/50.

David appeals, arguing that the superior court erred by determining a February 2010 separation date and by dividing the marital estate 50/50.

## III.  STANDARD OF REVIEW

"Determining 'the separation date is a fact-specific inquiry' "[2] reviewed for abuse of discretion.[3]  "There are three basic steps in the equitable division of marital assets:  (1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[4]  "A property division is an abuse of discretion if it is clearly unjust; it will also be set aside if it is based on a clearly erroneous factual finding or mistake of law."[5]

## IV.  DISCUSSION

### A.  The Superior Court Did Not Abuse Its Discretion By Determining February 2010 Was The Separation Date.

David contends the superior court erred by determining the parties' separation date was February 2010, when Linda filed for a domestic violence protective order and he moved out of the marital home, rather than February 2014, when she filed for divorce.  David admitted in his answer the complaint's allegation that the separation date was February 2010, but at trial he testified that the parties separated when Linda filed for divorce in 2014.  Generally "admissions made in the pleadings are conclusively

---

[2]    *Dundas v. Dundas*, 362 P.3d 468, 472 (Alaska 2015) (quoting *Tybus v. Holland*, 989 P.2d 1281, 1285 (Alaska 1999)).

[3]    *Tybus*, 989 P.2d at 1285.

[4]    *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015) (quoting *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013)).

[5]    *Dunmore v. Dunmore*, 420 P.3d 1187, 1190 (Alaska 2018) (quoting *Wagner v. Wagner*, 386 P.3d 1249, 1251 (Alaska 2017)).

established."[6]  But Linda has not argued on appeal that the answer conclusively established the separation date.  Moreover, this issue was actively litigated, and the court ruled on its merits.[7]  We therefore review whether the court abused its discretion by determining February 2010 was the separation date.

"Alaska law has defined [the separation date] as the point at which 'the marriage has terminated as a joint enterprise' or when a couple is no longer 'functioning economically as a single unit.' "[8]  "Determining 'the separation date is a fact-specific inquiry,' "[9] involving analysis of the parties' objective and subjective intent to terminate the marital relationship.[10]  The superior court "has considerable discretion in this area";[11] separation date determinations have been affirmed based upon various factors such as sexual relations, economic support, commingled assets, joint tax returns, joint liability, a manifested desire to continue the marriage, and one party's physical act of re-keying

---

**6**  *Darnall Kemna & Co. v. Heppinstall*, 851 P.2d 73, 76 (Alaska 1993) (holding admissions in answer conclusive of liability and affirming partial summary judgment) (citing 9 JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE § 2590, at 822 (James H. Chadborn rev. ed. 1981)).

**7**  *Cf. Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 394 (Alaska 2017) ("We have recognized trial by consent when the new issue was identified at the beginning of trial and litigated by both sides . . . .").

**8**  *Tybus*, 989 P.2d at 1285 (quoting *Hanlon v. Hanlon*, 871 P.2d 229, 231 (Alaska 1994)).

**9**  *Dundas v. Dundas*, 362 P.3d 468, 472 (Alaska 2015) (quoting *Tybus*, 989 P.2d at 1285).

**10**  *Id.* at 472 n.2 (quoting 1 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.28, at 435-36 (3d ed. 2005)).

**11**  *Id.* at 472 (citing *Schanck v. Schanck*, 717 P.2d 1, 3 (Alaska 1986)).

locks.[12]  We review whether the determination has sufficient evidentiary support in the record.[13]

### 1. Objective separation intent

The objective element of separation is that "the parties must separate — live physically apart from one another."[14]  Linda testified that the parties physically separated in February of 2010.  The superior court found that in February 2010 Linda filed for and obtained a long-term domestic violence protective order against David; he moved into his truck, and he never again lived in the marital home.

David nonetheless argues the date of separation should be February 2014 because his "presence at [the] marital home was unrestricted from the time of the 2010 [domestic violence] order until 2014," when one of his daughters informed him that the "locks were changed."  David cites Linda's testimony that from 2010 until 2014 "[he] would just come into the house whenever he wanted."  But her statement was in response to questions about his contact with their youngest child, not whether he still lived in the marital home.

Linda testified that David frequently came to the house to fix things he observed to be broken, although she did not want him to do so.  There is conflicting testimony about whether Linda asked David to come to the house to fix certain things; he concedes that at least some work was done without her knowledge or consent.  For example, David was installing a barbeque in the backyard as a "surprise" for Linda and

---

[12]    *Id.* at 473 (first citing *Inman v. Inman*, 67 P.3d 655, 659-60 (Alaska 2003); then citing *Tybus*, 989 P.2d at 1285).

[13]    *See Hanlon*, 871 P.2d at 231.

[14]    *Dundas*, 362 P.3d at 472-73 & n.2 (quoting 1 TURNER, *supra* note 10, § 5.28, at 435-36).

admits that he did not discuss it with her. He also testified that he moved out of the marital home in 2010 and that he never actually lived there again. Even if David did freely come and go from the house, the record supports the superior court's finding that David and Linda began "liv[ing] physically apart from one another"[15] in February 2010.

### 2. Subjective separation intent

"The subjective element is that at least one party must intend to terminate the marriage."[16] David contends both parties intended to continue working on the marriage from 2010 through 2014. For example, he notes they attended church counseling gatherings with other couples on Fridays; he alleges Linda commented at the 2010 domestic violence hearing that she wanted to continue working on the marriage; he points to his continued financial support, child care, and home improvements; and he cites his participation in refinancing the marital home. David argues that he did not subjectively intend to terminate the marriage in 2010. At trial he testified that he did not want a divorce and that the impending divorce was causing him to "fear for [his] eternal soul."

Linda testified at trial that she wanted to be separated in February 2010 and that in her mind there was no indication the parties were continuing to work on the marriage. Linda also testified that she made no effort to reconcile the marriage after David moved out in 2010. She informed him during the 2010 domestic violence proceedings of her desire to obtain a divorce, which he acknowledged; and she continued to attend Friday evening gatherings through their church only to maintain normalcy for their children. Linda testified that, even though David continued to make repairs and

---

[15]     *See id.* at 472 n.2 (quoting 1 TURNER, *supra* note 10, § 5.28, at 435-36).

[16]     *Id.* (quoting 1 TURNER, *supra* note 10, § 5.28, at 435-36).

improvements on the house, she did not want him there. Thus, evidence supports the superior court's finding that Linda's subjective intent was to end the marriage in 2010.

### 3. Joint economic enterprise

The superior court's findings also discussed the economic facets of the parties' marriage. The court found February 2010 to be the separation date because "[a]s of that date, the parties moved away from being an 'economic unit' or in any other sense a married couple." The court noted that the February 2010 separation date was a "close call due to the unique way the parties handled their finances long before 2010," but ultimately found that despite their "exceptionally dysfunctional marriage, . . . after 2010 the parties grew even further apart, including economically, such that in th[e] court's estimation they were no longer an 'economic unit.' They still had financial entanglements, but they did not act as a unit, no matter how that might be defined."

The superior court's assessment is supported by the evidence in the record. A few years into the marriage they ceased maintaining a joint bank account. Linda instead invoiced David each month for his share of the household expenses. This continued until February 2010, when David ceased making regular contributions. This shift in the parties' economic enterprise supports the February 2010 separation date.

### 4. Conclusion

Because the record, including the shift in finances, supports the parties' objective and subjective intentions to separate in February 2010, the superior court did not abuse its discretion by determining February 2010 was the separation date.

### B. Based On The Findings Made, It Was An Abuse Of Discretion To Divide The Marital Estate 50/50.

When addressing the marital estate division, the superior court repeatedly found "no reason to depart from the 50[/]50 presumption." David argues "[the court] committed clear error by accurately describing David's reduced circumstances, yet

neglecting to award him a commensurately larger portion of the marital estate."[17] "A property division is an abuse of discretion if it is clearly unjust; it will also be set aside if it is based on a clearly erroneous factual finding or mistake of law."[18]

"In determining the most equitable division, the 'starting point is the presumption that an equal division is the most just.' "[19] "The superior court may divide the [estate] unequally if it finds that such a division is just after considering" "the *Merrill v. Merrill* factors now codified in AS 25.24.160(a)(4)."[20] The factors[21] "are 'not

---

[17] David also argues that we should reverse and direct that a 70/30 property division be entered for him. But this would be procedurally improper. If we determine the "findings and evidence in the record do not justify" the superior court's marital estate division, we "vacate the property division and remand for an equitable division." *McDougall v. Lumpkin*, 11 P.3d 990, 993-94 (Alaska 2000).

[18] *Dunmore v. Dunmore*, 420 P.3d 1187, 1190 (Alaska 2018) (quoting *Wagner v. Wagner*, 386 P.3d 1249, 1251 (Alaska 2017)).

[19] *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008) (quoting *Burcell v. Burcell*, 713 P.2d 802, 805 (Alaska 1986)).

[20] *Id.* at 686 (footnote omitted); *see Tollefsen v. Tollefsen*, 981 P.2d 568, 570 (Alaska 1999) ("[I]n making an equitable division of the property, the superior court must state the facts forming the basis of the division and address the relevant statutory factors.").

[21] AS 25.24.160(a)(4) provides that "division of property must fairly allocate the economic effect of divorce . . . based on consideration of the following factors":

> (A) the length of the marriage and station in life of the parties during the marriage;

> (B) the age and health of the parties;

> (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and

(continued...)

exhaustive, and the trial court need not make findings pertaining to each factor, but its findings must be sufficient to indicate the factual basis for the conclusion reached.' "[22]

In *Day v. Williams* we vacated and remanded a property division because we were "unable to determine how the superior court reached its conclusion that an equal division was just and equitable given the facts and circumstances of the case and the court's rather cursory explanation."[23] We noted the court's failure to make a specific finding regarding the parties' health insurance although "it was apparent that [the wife] had incurred and would likely continue to incur significant health care expenses."[24] We also noted that, despite acknowledging the wife's income would be dramatically reduced

---

[21] (...continued)
custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division.

[22] *Young v. Lowery*, 221 P.3d 1006, 1014 (Alaska 2009) (quoting *Nicholson v. Wolfe*, 974 P.2d 417, 422 (Alaska 1999)).

[23] 285 P.3d 256, 262 (Alaska 2012).

[24] *Id.*

and the economic downturn had negatively impacted the parties' assets, the court "did not make any finding" how this "affected the equitable distribution of the marital property."[25] Ultimately, we held:

> When even a superficial examination and balancing of the statutory factors appear to weigh in favor of the spouse who earns substantially less than the other spouse, a conclusory statement that "a 50[/]50 distribution of the marital estate is fair given all of the circumstances" does not provide sufficient information to permit meaningful review.[26]

Similar to the wife in *Day*, David's income was substantially less than Linda's. At trial his income was about one-third less;[27] following trial his retirement income was halved by QDRO, leaving his income nearly two-thirds less than hers.[28] Also similar to the wife in *Day*, the superior court's examination and balancing of the relevant statutory factors weigh heavily in David's favor. The court found Linda was ten years younger, in better health,[29] had better earning capacity,[30] and had better health and

---

[25]    *Id.* at 263.

[26]    *Id.*

[27]    David's monthly income consisted of $1,450 from Social Security disability, $1,866 from his IBEW pension, and a potential benefit from National Electrical Benefit Fund of $352, totaling $3,668 per month. Linda earned $65,000 a year, or $5,417 per month.

[28]    Linda receives half of David's monthly IBEW pension and National Electrical Benefit Fund payments ($1,109) via QDRO, reducing his monthly income to $2,559 and increasing her monthly income to $6,526. David became eligible for Social Security in January 2018; this provides an additional income source, but it may also decrease his current pension payments.

[29]    *See* AS 25.24.160(a)(4)(B).

[30]    *See* AS 25.24.160(a)(4)(C).

retirement benefits.[31] The court also awarded Linda the marital home, the only real property in the marital estate, and designated one of her retirement accounts, a 401(K) valued at $178,000, as non-marital property.[32]

The superior court's justification for "find[ing] no reason to depart from the 50[/]50 presumption" rested primarily on the requisite equalization payment of $72,020 to David from a "small" estate that had "virtually no truly liquid assets." The court also noted David would have access to a furnished rental for 18 months at $600 per month and would have to pay for health insurance only until he qualified for Medicare in 2017, about 18 months after trial. The court reconsidered its presumptively even distribution three times after its initial supplemental findings, each time finding no reason to unevenly distribute the marital estate.[33] But — in light of the factors weighing heavily

---

[31]    *See* AS 25.24.160(a)(4)(D).

[32]    The superior court also was entitled to, but apparently did not, consider Linda's substantial separate assets when equitably dividing the marital property. *See Cartee v. Cartee*, 239 P.3d 707, 715 (Alaska 2010) (holding court's unequal marital property award to wife was not abuse of discretion because husband's " 'significant non-marital assets' would cushion him from the 'effects of an unequal property division' "); *see also* AS 25.24.160(a)(4)(D) (directing court to consider "the financial condition of the parties").

[33]    In May 2016 the court amended its supplemental findings to add that "any equalization payment [David] is to receive from Linda will likely not be paid . . . immediately." Despite finding it "a close call," the court was "not inclined to say that the marital estate should be unevenly divided."

In August the court ordered distribution of David's half of Linda's IRA, about $43,500, but it left her the option whether he kept his full monthly pension payments until her nearly $70,000 equalization payment was satisfied or she paid it in full. The court noted that "[it] ha[d] again considered the *Merrill* factors. With the exception of the IRA funds now available to [David], this court's *Merrill* findings remain unchanged."

(continued...)

in David's favor, particularly the substantial age, health, and income disparity, which the dissent does not discuss — we conclude that a post-division equalization payment cannot justify an equal division of this marital estate. Based on the findings the superior court made, the property division was clearly unjust.

We therefore vacate the superior court's property distribution and remand for further consideration.

## V. CONCLUSION

The superior court's separation date finding is AFFIRMED, but its presumptive 50/50 property distribution is VACATED and REMANDED for renewed consideration.

---

[33]    (...continued)
In October the court denied David's Rule 60(b) motion despite all factors appearing to weigh more heavily in his favor; although he had received the equalization payment, he was even less healthy due to kidney problems and was still living in his truck. But the court found that David had presented no "new evidence that would result in a different result" because it had already "specifically addressed his health issues in the context of the *Merrill* factors and allocation of the estate."

STOWERS, Chief Justice, dissenting in part.

I disagree with that part of the court's opinion that holds the superior court failed to sufficiently explain its 50/50 equitable distribution. I cannot conclude that the superior court failed to do so or that it abused its discretion in making a 50/50 equitable distribution. In its discretion, the court permissibly could have made an unequal distribution, but the abuse of discretion standard gives a trial court broad discretion, and on the facts and circumstances of this case, I do not think the court's decision violates any of the principles we have articulated in applying the abuse of discretion standard. Specifically, I do not think the court's decision grossly misweighed the statutory factors or was clearly unjust.

The court's opinion concludes that the superior court failed to sufficiently explain its 50/50 distribution of the marital estate given the findings it made. Unlike the *Day v. Williams*[1] case which the court cites, where the superior court made only a conclusory statement that a 50/50 distribution was fair,[2] the superior court here reviewed each relevant statutory factor *four times* and the husband concedes the court "thoroughly analyzed each factor."

We have held that "the trial court need not make findings pertaining to each factor, but its findings must be sufficient to indicate the factual basis for the conclusion reached."[3] We have stated that it is not the role of our court to reweigh the factors in our abuse of discretion analysis.[4] We have also explained that "when a couple has sufficient

---

[1]     285 P.3d 256 (Alaska 2012).

[2]     *Id*. at 263.

[3]     *Young v. Lowery*, 221 P.3d 1006, 1014 (Alaska 2009).

[4]     *Carr v. Carr*, 152 P.3d 450, 454 (Alaska 2007) ("[I]t is not our role as an
(continued...)

assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution."[5] A necessary corollary follows: when a couple does *not* have sufficient assets, it may not be possible or fair to both parties that the trial court depart from the presumptively fair 50/50 distribution of the property.

Applying these principles to the case at hand, there is no question that the parties' marital estate was modest and the trial court took this important fact into consideration. The superior court's justification for "find[ing] no reason to depart from the 50[/]50 presumption" rested, in part, on the division of the wife's marital pension via QDRO and the requisite equalization payment by the wife to the husband of $69,204 from a "small" estate that had "virtually no truly liquid assets." Also, the court considered that the husband was receiving some retirement benefits and would have access to Medicare beginning in 2017. When the court learned that the husband's share of the wife's marital retirement account could be withdrawn without penalty, it ordered that $43,534.50 be immediately paid to the husband plus any appreciation accrued since the date of separation. The immediate economic effect for the husband was a sizable lump sum payment from the wife's IRA, low or no health care costs under Medicare, and a nearly $70,000 equalization payment to supplement his own pension. Given the small size and illiquid nature of the estate, in my view it was within the range of acceptable discretion to divide the estate 50/50 and require the wife to pay the husband almost $70,000, and I think the court did an adequate job of explaining why it made this decision. I would affirm the superior court's 50/50 equitable distribution and I therefore

---

[4]    (...continued)
appellate court to reweigh the evidence . . . .").

[5]    *Odom v. Odom*, 141 P.3d 324, 340 n.75 (Alaska 2006).

dissent from this portion of the court's opinion.  I agree with this court's conclusion that the superior court did not abuse its discretion in selecting the date of separation.