NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JAMES J., | ) |
| | ) Supreme Court Nos. S-18630/18670 |
| Appellant, | ) (Consolidated) |
| | ) |
| v. | ) Superior Court No. 3AN-21-08619 CI |
| | ) |
| RASHAE J., | ) <u>MEMORANDUM OPINION</u> |
| | ) <u>AND JUDGMENT</u>* |
| Appellee. | ) |
| | ) No. 2048 – October 2, 2024 |
| | ) |
| RASHAE J., | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| JAMES J., | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge.

Appearances: James J., pro se, Chugiak, Appellant in File No. S-18630 and Appellee in File No. S-18670. Jimmy E. White, Hughes White Colbo & Tervooren, LLC, Anchorage,

---

\*      Entered under Alaska Appellate Rule 214.

for Appellee in File No. S-18630. Rashae J., pro se, Chugiak, Appellant in File No. S-18670.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices. Pate, Justice, dissenting in part.

## I.    INTRODUCTION

A couple separated after 14 years of marriage. Following trial the superior court awarded primary physical custody of the couple's six children to the wife, finding that there was no history of domestic violence that would justify applying the statutory presumption against custody; calculated child support pursuant to the formula in Alaska Civil Rule 90.3; divided the marital property 60/40 in the wife's favor; and awarded the wife $10,000 in attorney's fees based on the parties' different economic circumstances.

The parties filed separate appeals, which we have consolidated for purposes of this decision. The husband argues in his appeal that the court clearly erred in its findings on domestic violence and that it abused its discretion when it found that the parties' separation date was the date he filed his divorce complaint, rather than when the parties physically separated a year and a half earlier. The wife argues in her appeal that the court erred by not applying an upward variance to the Rule 90.3 child support award; by relying on a demonstrative and unreliable exhibit in its calculation of the interim support the husband had voluntarily paid after separation; and by not awarding her more attorney's fees.

We conclude that the evidentiary basis for the court's selected separation date is not apparent from the record, and we remand for the court's reconsideration of that issue and, if necessary, of financial issues that depend on that date. We otherwise affirm the superior court's decisions.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

James and Rashae J.[1] married in April 2005 and have six children, who at the time of trial were ages 7 to 16.  James is a federal employee and at the time of trial had an annual salary of roughly $138,000, with benefits including retirement accounts and health insurance.  Rashae has a journalism degree, has worked as a freelance journalist, and was the director of a pregnancy resource center at the time of trial; because she spent most of the marriage caring for the children, her ability to find high-paying work after separation was limited.  Her projected gross annual income at the time of trial was less than $18,000.

James moved out of the marital home in May 2019 and filed a complaint for divorce in November 2021.  After moving out he continued to deposit his entire paycheck in a joint checking account out of which Rashae paid family expenses.  Both James and Rashae also used a credit card that was paid out of that account until February 2022, when James began using his own credit card and allocating only a portion of his paycheck to the joint account.  In August 2022 he started contributing to the account only what he believed the law required for child support, less what he calculated he was spending on the mortgage, the family vehicle, and insurance.

### B.    Proceedings

James's divorce complaint and its attachments asked, among other things, that Rashae be given primary physical custody of the children and that she be awarded child support well in excess of the amounts required under Civil Rule 90.3.[2]  He asserted a separation date of May 12, 2019, the last night he spent at the marital home, and Rashae agreed in her answer "that the separation occurred in May, 2019."

---

[1]    We use an initial in lieu of the parties' last name to protect their privacy.

[2]    By James's calculations, he owed $3,894.63 per month as calculated under Rule 90.3(a); he "offer[ed] to deviate upward from that to" $6,301.12 per month.

When Rashae filed her trial brief ten months later, however, she contended that although the parties had physically separated in May 2019, "the appropriate date of separation" should be the date James filed his complaint — in November 2021 — because the parties' "finances remained commingled" up to that time and beyond. In James's trial brief he alleged, apparently for the first time, that Rashae had been "violent during the marriage." He asked for primary custody of the children until Rashae completed an anger management and batterers' intervention course. He argued against any award of spousal support on the grounds that awarding Rashae 55% of the marital property, as he proposed, should suffice to get her on her feet financially. And he argued that the separation date was May 12, 2019, because the parties had agreed on that date in their initial pleadings.

At trial the parties testified about four incidents that James alleged constituted a history of domestic violence by Rashae. In 2016 the parties scuffled over James's phone in connection with her discovery of what he described at trial as an "emotional affair." In 2017 they had an altercation of some kind that Rashae tied to a later miscarriage, though the details are disputed. On a 2018 trip to Las Vegas, according to James, Rashae physically prevented him from leaving their hotel room until hotel security arrived; Rashae testified that she suffered a cut to her arm when James pushed her against a wall during this incident. James alleged a fourth incident in which Rashae punched him while they were in their vehicle, though Rashae denied this incident entirely.

To support his proposed 55/45 division of marital property, James created a spreadsheet that purported to show his post-separation payments to Rashae. For May 2019 through January 2022, the spreadsheet lists James's income, an estimate of his personal expenses (usually $1,000 per month), and the difference, labeled "Benefit to Rashae." The spreadsheet shows an increase in his expenses and a corresponding decrease in the "Benefit to Rashae" column beginning in February 2022. James

testified that this apparent increase in his expenses was the result of "trying to pay down credit card debts." The spreadsheet also lists James's other claimed post-separation payments, such as car payments and cash transfers to Rashae, totaling approximately $50,000.

### C.    The Superior Court's Decision

In an oral decision the court found that "both parents express[ed] a sincere desire to care for the children" and were capable of meeting the children's needs. The court did not apply the domestic violence presumption because it found that the evidence was insufficient to show who was the aggressor and who was the victim in the incidents the parties identified. The court ordered both parties to take anger management classes. It awarded the parties joint legal custody of the children and awarded Rashae primary physical custody.

In the court's later written findings of fact and conclusions of law, it found that the parties' separation date was November 23, 2021, the day James filed for divorce. The court divided the marital property 60/40 in Rashae's favor, with James ordered to make an equalization payment of $71,109. As part of its calculations, the court credited James with having voluntarily paid some interim spousal support based on the amounts shown in the "Benefit to Rashae" column in his spreadsheet. It concluded that he had transferred $60,717.43 to Rashae between their separation and the trial, then subtracted the child support due during that period ($42,840.93), leaving the sum of $17,876.50 as voluntary interim spousal support, which the court included in Rashae's 60% share of the marital property.

Also pertinent to this appeal are the superior court's award of $10,000 to Rashae for attorney's fees, based on her financial dependence on James during the litigation, and the court's calculation of child support pursuant to the formula in Civil Rule 90.3. James appeals the custody decision and the court's decision that the parties

separated in November 2021, while Rashae appeals the court's calculation of interim spousal support, its calculation of child support, and the attorney's fees award.[3]

## III.  STANDARD OF REVIEW

We will reverse child support awards only for an abuse of discretion or the application of the wrong legal standard.[4]  We will find an abuse of discretion when a decision is arbitrary, capricious, manifestly unreasonable, or improperly motivated, or when the superior court has failed to consider statutorily mandated factors, weighed them improperly, or used improper factors in its decision.[5]  The correct legal standard is a question of law we review de novo;[6] specifically, "[w]e exercise our 'independent judgment when interpreting the Alaska Rules of Civil Procedure.' "[7]  Factual findings that underlie child support calculations are reviewed for clear error, as are all findings of fact — and factual error is clear only if it leaves us with "a definite and firm conviction that the trial court has made a mistake."[8]

---

[3]  Rashae also contends that James "has not paid the full amount of child support obligated under the standard 90.3 calculation since July 2022," but enforcement of the child support order should be addressed to the superior court in the first instance; our record does not show that this has been done.  Finally, Rashae disputes the superior court's decision to allow James to claim the children as dependents and certain details of the custody schedule.  Because these issues are raised for the first time in the reply brief — meaning that James lacked the opportunity to respond to them — we do not consider them either.  *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991).

[4]  *Schaeffer-Mathis v. Mathis*, 407 P.3d 485, 491 (Alaska 2017).

[5]  *Christopher D. v. Krislyn D.*, 426 P.3d 1118, 1120-21 (Alaska 2018).

[6]  *Schaeffer-Mathis*, 407 P.3d at 491.

[7]  *Coleman v. McCullough*, 290 P.3d 413, 414 (Alaska 2012) (quoting *Joseph v. State*, 26 P.3d 459, 463 (Alaska 2001)).

[8]  *Stockton v. Stockton*, 532 P.3d 735, 738 (Alaska 2023) (quoting *Rohde v. Rohde*, 507 P.3d 986, 992 (Alaska 2022)); *Schaeffer-Mathis*, 407 P.3d at 491.

"Whether the court's findings on domestic violence are supported by the record is a question of fact which we review for clear error."[9] However, "whether the court's findings support applying the [domestic violence] presumption . . . is a question of law, which we review de novo."[10] "[W]e do not reweigh the evidence or reassess the trial court's determinations of witness credibility."[11]

Trial courts have broad discretion when dividing marital property, so we review those decisions for abuse of discretion.[12] "The award of attorney's fees in a divorce action rests within the broad discretion of the superior court, and will not be disturbed on appeal unless it is 'arbitrary, capricious, manifestly unreasonable, or stems from an improper motive' " — in other words, fee awards are reviewed for abuse of discretion.[13] Also reviewed for an abuse of discretion is the trial court's determination of the parties' separation date.[14]

## IV. DISCUSSION

### A. The Evidentiary Basis For The Superior Court's Selected Separation Date Is Not Sufficiently Apparent For Purposes Of Our Review.

The parties' separation date is often critical to the superior court's decision regarding marital property and child support issues.[15] It is "the point at which 'the

---

[9] *Yelena R. v. George R.*, 326 P.3d 989, 998 (Alaska 2014).

[10] *Id.*

[11] *Harris v. Governale*, 311 P.3d 1052, 1057 (Alaska 2013).

[12] *Day v. Williams*, 285 P.3d 256, 260 (Alaska 2012).

[13] *Ruppe v. Ruppe*, 358 P.3d 1284, 1289 (Alaska 2015) (quoting *Stevens v. Stevens*, 265 P.3d 279, 284 (Alaska 2011)).

[14] *Fletcher v. Fletcher*, 433 P.3d 1148, 1152 (Alaska 2018).

[15] *See, e.g.*, *Dundas v. Dundas*, 362 P.3d 468, 472 (Alaska 2015) ("Because the separation date may determine whether acquired property is marital or separate, this date is critical to the identification and valuation of the marital estate . . . ."); *Christopher D. v. Krislyn D.*, 426 P.3d 1118, 1123 (Alaska 2018) ("We have repeatedly recognized that child support should be calculated from the date of separation.").

marriage has terminated as a joint enterprise' or when a couple is no longer 'functioning economically as a single unit.' "[16] Fixing the separation date is a "fact-specific inquiry" that involves an "analysis of the parties' objective and subjective intent to terminate the marital relationship."[17]

Here, the superior court found that the separation date was November 23, 2021, the date James filed his divorce complaint, but it did not explain why it chose that date. James argues that the finding was in error. He points to Rashae's agreement, in her answer, with his complaint's assertion that the separation date was in May 2019, and he relies on the general rule that "admissions made in the pleadings are conclusively established."[18]

At trial Rashae acknowledged that the parties had physically separated in 2019 but, notwithstanding their agreement in the pleadings, argued that the separation date should be the date of James's complaint because the parties were still commingling their finances at that point and in fact continued to do so until early 2022. But the evidence Rashae points to — primarily the shared bank account into which James continued to deposit his paychecks and from which Rashae continued to pay the family's expenses — is not conclusive. Financial entanglements do not necessarily mean that a couple continues to act as a single economic unit.[19] The evidence in this case could lead instead to the conclusion that James, post-separation, supported two separate economic units with his salary, the marriage having ended long before. Without findings regarding the parties' intent, we are unable to determine whether the

---

[16]     *Tybus v. Holland*, 989 P.2d 1281, 1285 (Alaska 1999) (quoting *Hanlon v. Hanlon*, 871 P.2d 229, 231 (Alaska 1994)).

[17]     *Fletcher*, 433 P.3d at 1152.

[18]     *Darnall Kemna & Co. v. Heppinstall*, 851 P.2d 73, 76 (Alaska 1993).

[19]     *See Fletcher*, 433 P.3d at 1154 (affirming a finding that divorcing couple no longer acted as "economic unit" despite continuing "financial entanglements").

court properly exercised its discretion when it selected the date the complaint was filed as the separation date. We therefore vacate the superior court's separation date finding and remand for reconsideration of this issue.

On remand the court will need to address the effect of the parties' stipulation in their pleadings to a different separation date. James correctly cites "[t]he general rule," as we described it in *Darnall Kemna & Co. v. Heppinstall*, "that admissions made in the pleadings are conclusively established."[20] But the "general rule" has an important caveat not mentioned in *Darnall Kemna*: "In view, however, of the commendable purpose which leads (or ought to lead) to the voluntary making of admissions, it is always said — and properly so — that the trial court has discretion to avoid the consequences of conclusiveness of an admission."[21] The separation date affects, among other things, the amount of child support, which the superior court has the duty to evaluate independently regardless of the stipulations of the parties;[22] this consideration may influence the court's willingness to hold the parties to an early

---

[20]     851 P.2d at 76.

[21]     JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE: EVIDENCE IN TRIALS AT COMMON LAW § 2590 (4th ed., 2024-1 cum. supp. 1985).

[22]     *See, e.g.*, *Keating v. Traynor*, 833 P.2d 695, 696 (Alaska 1992) ("[A] parent may not waive the requirements of Rule 90.3 by private agreement."); *Cox v. Cox*, 776 P.2d 1045, 1048 (Alaska 1989) (observing that Rule 90.3 "guidelines reflect a paternalistic view toward child support agreements which conflicts with the freedom of contract attitude exemplified by [earlier case law]" so that "[p]arents may not make a child support agreement which is not subject to the rule").

agreement.[23] The superior court may also consider whether the parties constructively amended their pleadings by trying the separation date issue by consent.[24]

The separation date was critical to the court's determination of two financial issues: the amount to be credited to James for the voluntary payment of interim spousal support post-separation and the point at which he began to owe child support. The court will need to revisit these issues if it decides on a different separation date on remand.[25]

## B. The Court Did Not Err Or Abuse Its Discretion In Its Findings About Domestic Violence.

"There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent . . . may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a

---

[23] *Cf. Henash v. Ipalook*, 985 P.2d 442, 450 (Alaska 1999) (explaining that whether to respect a stipulation by the parties depends on three factors, specifically whether "(1) resolving this case by referring to the parties' stipulation would not 'taint the future consideration of that important issue'; (2) the impact on non-parties is inconsequential; and (3) the stipulation did not impermissibly invade the prerogatives of this court" (quoting *City & Borough of Sitka v. Constr. & Gen. Laborers Loc. 942*, 644 P.2d 227, 234-36 (Alaska 1982))).

[24] *See* Alaska R. Civ. P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 394-97 (Alaska 2001) (explaining that "[p]rejudice to the opposing party is an important consideration" when determining whether tardy amendment should be allowed).

[25] While making this reassessment, the court should also take note of a potential clerical error. The signed child support order is not in our record, but if the court's final calculations relied on James's child support affidavit, they may have imported an error. Line H(2) of the affidavit requires the obligor to subtract half the cost of the children's health insurance. But James entered $515, the entire cost. Correcting this apparent error would increase monthly child support by approximately $258.

child."[26] James argues that the superior court erred by failing to apply this presumption against Rashae.

The court discussed the parties' testimony about the alleged domestic violence in its oral decision following trial. Given the conflicts in the testimony, the court concluded that it could not find by a preponderance of the evidence that either party was perpetrator or victim; it found instead that both parties had "anger issues . . . [n]ot unusual of divorcing parents in contentious situations," and that the incidents they described were best characterized as "mutual combat and situational violence around the deteriorating relationship between the parties." The court therefore concluded that "the evidence does not support the court applying the presumption to either parent."

James challenges the court's implication that the parties' conflict was prompted by his alleged infidelity, arguing that "if suspicions that a romantic partner might be cheating are allowed to excuse domestic violence, the law's intent to protect children will be frustrated." He further argues that the court's finding that Rashae believed he was cheating on her undercut her claim that he was the aggressor. And he faults the court for giving weight to the fact that the children never witnessed the alleged domestic violence, observing that "domestic violence almost always occurs without witnesses."

But when "findings are largely dependent on oral testimony," as they are here, we defer to the superior court because of its better opportunity to judge witness credibility.[27] James's challenges essentially ask that we reweigh the testimonial evidence and conclude that Rashae instigated the violence, but this is something we

---

[26] AS 25.24.150(g).

[27] *Griffith v. Hemphill*, 521 P.3d 584, 591 (Alaska 2022).

cannot do.[28]  Because the court's factual findings are not clearly erroneous, it did not err by declining to apply the domestic violence presumption in its award of custody.

>  **C.**   **The Superior Court Did Not Abuse Its Discretion By Ordering Child Support Without An Upward Variance From The Rule 90.3 Calculation.**

Civil Rule 90.3 provides that the child support awarded to the parent with primary physical custody "will be calculated as an amount equal to the adjusted annual income of the non-custodial parent multiplied by a percentage" that depends on the number of children supported.[29]  A superior court adhering to this formula has presumptively acted within its discretion.[30]  But "[t]he court *may* vary the child support award as calculated under the other provisions of this rule for good cause."[31]  Establishing good cause requires "clear and convincing evidence that manifest injustice would result" from the usual Rule 90.3 calculation.[32]  This may include a showing of "unusual circumstances."[33]  The evidence should show that the award calculated under the usual formula "substantially exceeds or falls short of the amount needed to provide for the child[ren]'s reasonable needs."[34]

---

[28]  *See Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 334 P.3d 165, 176 (Alaska 2014) (noting that once superior court makes credibility determination, "our role as the reviewing court is not to reweigh the evidence on this point").

[29]  Alaska R. Civ. P. 90.3(a).

[30]  *Kristina B. v. Edward B.*, 329 P.3d 202, 212 (Alaska 2014).

[31]  Alaska R. Civ. P. 90.3(c)(1) (emphasis added); *see Gerber v. Juneau Bartlett Mem'l Hosp.*, 2 P.3d 74, 76 (Alaska 2000) ("In contrast to the term 'shall,' the term 'may' generally denotes permissive or discretionary authority and not a mandatory duty.").

[32]  Alaska R. Civ. P. 90.3(c)(1).

[33]  *Id.*

[34]  *Coats v. Finn*, 779 P.2d 775, 777 (Alaska 1989).

Rashae argues that the superior court erred by not applying an upward variance to the Rule 90.3 award. She gives three reasons: the large disparity in the parties' incomes, the number and ages of the children, and inflation-related increases in the cost of living. Had Rashae argued for an upward variance at trial based on these factors, the court may have decided one was justified.[35]

But while the superior court is obliged to consider "any provision of Rule 90.3 whose application is urged by a party where a sufficient factual predicate is established,"[36] Rashae made no specific request for child support at trial beyond "an accurate child support calculation." The circumstances on which she now relies were discussed at trial, but not in the context of a deviation from the Rule 90.3 formula. Simply put, she never asked the superior court for a variance. The court cannot be faulted for failing to find clear and convincing evidence that the usual Rule 90.3 award was too low to meet the children's needs when the parties never compared those needs with the 90.3 award at trial.[37]

---

[35]     *See* Alaska R. Civ. P. 90.3 cmt. VI.B (stating that examples of unusual circumstances justifying a deviation "include especially large family size . . . or other extraordinary expenses . . . . and [t]hat determination should be made considering the custodial parent's income").

[36]     *Renfro v. Renfro*, 848 P.2d 830, 832 (Alaska 1993).

[37]     In her reply brief Rashae presents an itemized list of household expenses for the months leading up to trial. While her claimed expenses exceed the Rule 90.3 monthly child support payment, it is not necessarily the case that child support awards, even from a noncustodial parent with a disproportionately large income, need to cover all the children's expenses. Again, this is not to say that Rashae could not have proven the insufficiency of her income and the child support award had she attempted to do so at the trial level. But " 'it is the duty of the parties, not the court, to ensure that all necessary evidence is presented at trial' in divorce proceedings and . . . a party who fails to present sufficient evidence may not later challenge the adequacy of the evidence on appeal." *Odom v. Odom*, 141 P.3d 324, 338 (Alaska 2006) (quoting *Brandal v. Shangin*, 36 P.3d 1188, 1193 (Alaska 2001)).

It is true that James initially asked that child support be set at an amount significantly in excess of a Rule 90.3 calculation. But he abandoned that position in his trial brief, in which he asked that he be awarded primary physical custody of the children until Rashae had completed an anger management course. Given that the court's Rule 90.3 calculation is presumptively correct, it did not abuse its discretion by failing to apply a variance in the absence of either party's request that it do so.

### D. The Superior Court Did Not Err By Relying On James's Demonstrative Exhibit For His Post-Separation Contributions To Family Finances.

When dividing the marital property, the superior court credited James with $17,876.50 in interim spousal support he had paid voluntarily, and it therefore included this amount in Rashae's 60% of the marital property. The court arrived at this number by using figures provided in the spreadsheet James presented at trial. Rashae argues that the spreadsheet was inaccurate and that the court's reliance on it was error because it was introduced only for demonstrative purposes.

But James testified about the methodology and the figures he used to create the spreadsheet. We addressed a similar issue recently. In *Rohde v. Rohde* the superior court admitted, for demonstrative purposes, a list of expenses a wife claimed to have paid on her husband's behalf.[38] We explained that because the wife "testified extensively about the listed expenses at trial, and the court's reference to the demonstrative exhibit as a convenient summary was consistent with the purpose of its admission," the court had not erred by relying on the list.[39] Our conclusion here is the same.

---

[38] 507 P.3d 986, 998 (Alaska 2022).

[39] *Id.*

We review the factual findings based on James's spreadsheet and supporting testimony for clear error.[40] The superior court was entitled to rely on that evidence if it found it credible (as it apparently did), and "we will not re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[41] The only question, then, is whether the superior court's findings about James's expenditures have clear support in the record.

Rashae cites bank statements from the shared checking account as evidence that James's demonstrative exhibit failed to correctly identify his post-separation contributions. Her argument is somewhat confusing, as she contends based on the bank statements that James deposited $36,152 into the joint account between February and September 2022, whereas his spreadsheet shows a lower figure: $31,265.92. If Rashae's evidence shows an error for this period of time, the error appears to have been to her advantage.[42]

Rashae also contends that James's numbers grossly underestimate his personal expenses because he used "the joint family credit card . . . for his personal purchases and bachelor lifestyle," and until February 2022 this credit card was paid off from the joint family account; in other words, his personal expenses were more than the $1,000 per month he claimed, the excess being paid out of the "Benefit to Rashae"

---

[40] *Stockton v. Stockton*, 532 P.3d 735, 738 (Alaska 2023).

[41] *Fink v. Mun. of Anchorage*, 379 P.3d 183, 192 (Alaska 2016); *see also Hockema v. Hockema*, 403 P.3d 1080, 1090 (Alaska 2017).

[42] The bank statements show that James deposited $4,793.97 in February 2022 and $6,535.54 in March 2022 — not counting $437.58 that he appears to have deposited and then used to pay a credit card bill — for a total of $11,329.51. The spreadsheet shows $5,097 each month, for a total of $10,194. The spreadsheet therefore seems to be fairly imprecise, but it may also undercount James's contributions rather than inflate them.

column shown on his spreadsheet. While again this is a plausible argument, Rashae does not point to evidence of James's expenses that is strong enough to show clear error or to overcome our deference to the superior court's evaluation of witness credibility.[43] James's spreadsheet may be imprecise, but Rashae fails to demonstrate that the superior court clearly erred by relying in part on what it showed.

E.   **The Court Did Not Err Or Abuse Its Discretion In Its Award Of Attorney's Fees To Rashae.**

The superior court awarded Rashae $10,000 in attorney's fees "[i]n order to ensure a level playing field, and in light of the fact that Rashae was financially dependent on James during the divorce litigation."[44] Rashae had asked for $30,000, primarily because of the economic disparity between the parties but also, impliedly, because of James's changed positions between his complaint and trial. On appeal she

---

[43]   On appeal Rashae claims that "all the evidence was there in the exhibit folders, if only the judge had properly reviewed the credit card statements and all the testimony revealing James'[s] excessive personal spending." The only exhibits associated with the joint credit card are Exhibits O and P, which show the card balance but no itemized list of purchases. Rashae argues that she could not adequately respond to the spreadsheet at trial because it was not made available beforehand, but she did not object to the exhibit's admission on those grounds or ask for more time to prepare to address it. She did testify to some of James's spending, but the trial court still had the discretion to credit James's explanation of the financial situation. The specific documentary evidence of excessive spending she identified at trial (such as the money that James transferred to the joint checking account in August 2020 — an apparent reimbursement for dues paid to a cigar club — but then took back out of the account) is not specifically tied to the joint credit card and occurred outside of the time during which James was paying interim support as currently calculated, and therefore does not clearly contradict the trial court's calculation of interim support; the evidence may be more relevant if the date of separation is changed on remand.

[44]   *See Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987) (describing purpose of attorney's fees awards in divorce as "to assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane").

renews these arguments for a higher award, though with a greater emphasis on the allegedly vexatious way James litigated.

### 1. The superior court adequately addressed the income disparity between the parties.

We first address Rashae's argument that the attorney's fees award "failed to level the economic playing field between the high-income noncustodial father and the low-income custodial mother." We cannot say that the $10,000 award failed to achieve its intended purpose. "[A] party's economic situation includes more than simply earning power; the property division itself is relevant . . . . In particular, we have stressed that a party who receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own attorney's fees."[45] Rashae claims that she incurred $51,000 in attorney's fees. The superior court's 60/40 division of the marital estate in Rashae's favor included an equalization payment of $71,109 from James, more than enough cash to cover her legal fees without considering the nonliquid assets. In these circumstances we cannot say that the court failed to adequately consider the parties' economic positions when exercising its discretion to award Rashae $10,000 in fees.

### 2. The trial court did not err when it ruled that there had been no bad faith or vexatious litigation.

Rashae also challenges the superior court's failure to enhance her attorney's fees award based on James's alleged bad faith or vexatious litigation. She contends that James acted vexatiously by changing his position on several issues — primarily custody and domestic violence — between his initial complaint and trial.

---

**45**    *Tybus v. Holland*, 989 P.2d 1281, 1289 (Alaska 1999) (citations omitted); *see also Stevens v. Stevens*, 265 P.3d 279, 290-91 (Alaska 2011) ("A party's economic situation includes the divorce property division, and a party who receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own fees.").

The primary purpose of the initial pleadings is to give the opposing party notice of what is at issue.[46] But it is expected that parties' positions may evolve as litigation progresses (as, for example, when Rashae changed her position on the separation date); the Civil Rules provide for such changes. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."[47] While pleadings can be amended to reflect these new arguments, "failure so to amend does not affect the result of the trial of these issues."[48] Consent can be implied if both parties address the issue's substantive merits at trial.[49] Rashae had notice before trial of James's changed position on custody and his new allegations of domestic violence and a full opportunity to litigate them.

Nor do we see any unfair prejudice from James's changed positions.[50] Rashae claims that "[m]ost of the four trial days were consumed by James'[s] vexatious claims," but his new allegations of domestic violence appear to have taken up only a

---

[46] *See Doan v. Banner Health Inc.*, 535 P.3d 537, 549-50 (Alaska 2023) (stating that "fairly lenient 'notice pleading' standard" of Alaska Civil Rule 8(a) "is satisfied by a brief statement that give[s] the defendant fair notice of the claim and the grounds upon which it rests" (alteration in original) (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 181 (Alaska 2009))).

[47] Alaska R. Civ. P. 15(b).

[48] *Id.*

[49] *Oaksmith v. Brusich*, 774 P.2d 191, 199 (Alaska 1989); *Asher v. Alkan Shelter, LLC*, 212 P.3d 772, 779 (Alaska 2009), *abrogated on other grounds by Shaffer v. Bellows*, 260 P.3d 1064 (Alaska 2011).

[50] *See Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 394-97 (Alaska 2001) (explaining that "[p]rejudice to the opposing party is an important consideration" when deciding whether to allow tardy amendment of pleadings).

small fraction of the trial time.[51] And "contentiousness over difficult issues . . . do[es] not, in [itself], constitute bad faith or vexatious conduct. These are by-products of the adversarial system itself."[52] Had James's claims been "so lacking in merit that it [would have been] permissible to infer that [he] or his lawyer acted in bad faith," the judge could have found them to be vexatious.[53] But rather than find that the claims totally lacked merit, the court concluded that they "came down to a 'he said, she said' situation" in which neither party's version of the facts could prevail.

Rashae also cites as vexatious conduct James's "long history of canceling scheduled visits" with the children, "including twice during the trial," as well as allegations of violence against unrelated parties. But she does not demonstrate that this conduct interfered with her ability to prepare for trial or otherwise litigate on an even plane.[54] We cannot say that the superior court abused its discretion when it declined to enhance Rashae's attorney's fees award due to her claims of vexatious litigation.

---

[51] The log notes, although not authoritative, indicate that about 45 minutes of testimony were devoted to the new domestic violence allegations across the four days of trial.

[52] *Kowalski v. Kowalski*, 806 P.2d 1368, 1373 (Alaska 1991).

[53] *Bragg v. Teslow*, 533 P.3d 533, 539 (Alaska 2023) (quoting *Johnson v. Johnson*, 239 P.3d 393, 401 (Alaska 2010)).

[54] We have held that the bad faith conduct necessary to support an enhancement of attorney's fees under Alaska Civil Rule 82(b)(3)(G) (allowing consideration of "vexatious or bad faith conduct") must have occurred "during the litigation, not during the underlying transaction that is the subject of the litigation." *Keenan v. Meyer*, 424 P.3d 351, 361 (Alaska 2018) (quoting *Cole v. Bartels*, 4 P.3d 956, 961 n.24 (Alaska 2000)). But out-of-court conduct done "specifically to give [one party] leverage in the ongoing litigation" may properly be considered. *Id.* at 362.

## V.    CONCLUSION

We VACATE the superior court's finding that the date of separation was the day the divorce complaint was filed and REMAND for reconsideration of that date and, if necessary, of financial issues dependent on that date.  In all other respects we AFFIRM the decisions of the superior court.

PATE, Justice, dissenting in part.

I respectfully dissent from the court's decision to vacate the date-of-separation finding. I would affirm the superior court's decision in its entirety.

The court concludes that the superior court made insufficient findings for this court to evaluate whether the superior court abused its discretion. A trial court's finding simply stating the date of separation, without more, would ordinarily be insufficient and require remand. But the findings need only be specific enough to "allow us to glean from the record what considerations were involved."[1] Under the circumstances of this case, where the superior court selected the date that the complaint was filed as the date of separation, the basis for the court's finding is apparent from the record.

In *Hatten v. Hatten*, we identified four dates that are potentially relevant to determining the date a marriage terminated as a joint enterprise: (1) the date the parties physically separated for the first time, (2) the date one party filed for divorce, (3) the date the divorce decree was issued, and (4) the date of trial.[2] The trial court's selection of the second option, the date the complaint was filed, is an implicit and clear determination that the marriage did not terminate before this date.

There is ample support in the record to affirm this determination. The parties continued to support each other economically, commingle their assets, and file joint tax returns until James filed the divorce complaint in November 2021. We have repeatedly affirmed decisions determining the date of separation based on similar

---

[1]    *Bird v. Starkey*, 914 P.2d 1246, 1249 n.4 (Alaska 1996).

[2]    917 P.2d 667, 671 (Alaska 1996).

evidence.[3] I would therefore apply the abuse of discretion standard and conclude that the trial court did not abuse its discretion by selecting November 23, 2021, as the date of separation.

Under the abuse of discretion standard, we will reverse only "when the decision on review is manifestly unreasonable."[4] James argues that the trial court abused its discretion by selecting the November 2021 date, pointing to Rashae's answer, which admitted that the separation date was in May 2019, when the parties first physically separated. But he presents no other evidence that suggests the trial court's choice of Rashae's proposed date was manifestly unreasonable. It was clear at the start of trial that the date of separation was in dispute, and both sides actively litigated the issue. In selecting Rashae's proposed date of separation, the trial court implicitly rejected James's position and determined that the evidence favored Rashae's date. Weighing conflicting evidence is the function of the trial court.[5]

I agree with the court that the evidence is not "conclusive" as to the date of separation. But the basis for the trial court's determination is apparent from the record, and nothing in the record suggests this determination was manifestly unreasonable. Further, I question the utility of remanding this case when the trial court

---

[3]    *See Fletcher v. Fletcher*, 433 P.3d 1148, 1153 (Alaska 2018) (holding that court may determine separation date by reference to "economic support, commingled assets, [and] joint tax returns"); *Faris v. Taylor*, 444 P.3d 180, 185 (Alaska 2019) (pointing to record evidence that "a financial entanglement continued," including jointly owned properties and joint tax returns, as justifying superior court's selection of date of separation); *Dunmore v. Dunmore*, 420 P.3d 1187, 1195 (Alaska 2018) (referencing shared finances and joint tax returns as supporting superior court's choice of date of separation).

[4]    *Doan v. Banner Health Inc.*, 535 P.3d 537, 544-45 (Alaska 2023) (quoting *Sykes v. Lawless*, 474 P.3d 636, 646 (Alaska 2020)).

[5]    *Hockema v. Hockema*, 403 P.3d 1080, 1090 n.23 (Alaska 2017) (quoting *Fink v. Mun. of Anchorage*, 379 P.3d 183, 192 (Alaska 2016)).

would be well within its discretion to confirm its date-of-separation determination based on the evidence already in the record.  I would affirm the trial court's decision in all respects.